UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| NAVAJO HEALTH FOUNDATION – SAGE MEMORIAL HOSPITAL, INC. (doing business as "Sage Memorial Hospital"); an Arizona non-profit corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>RAZAGHI DEVELOPMENT COMPANY, LLC; a Nevada limited liability company (doing business as "Razaghi Healthcare"), AHMAD R. RAZAGHI; individually, TAUSIF HASAN; individually, DOES 1-10; ROES A-Z;<br><br>        Defendants. | Case No. 2:19-cv-00329-GMN-EJY<br><br>**ORDER**<br>**and**<br>**REPORT AND RECOMMENDATION**<br><br>Re:  Plaintiff's Motion for Leave to File First Amended Complaint (ECF No. 76) |

Before the Court are (1) Defendants' Motion to Stay Discovery and/or for Reconsideration of Order Denying Stipulation to Stay Discovery (ECF No. 56), Plaintiff's Opposition (ECF No. 65), and Defendants' Reply (ECF No. 71); (2) Defendants' Motion for Protective Order to Limit Subpoenas (ECF No. 72), Plaintiff's Opposition (ECF No. 77), and Defendants' Reply (ECF No. 85); (3) Plaintiff's Motion for Leave to File First Amended Complaint [the "FAC"] (ECF No. 76), Defendants' Opposition (ECF No. 88), and Plaintiff's Reply (ECF No. 95); (4) Plaintiff's Motion to Compel Production of Documents (ECF No. 98), Defendants' Opposition (ECF No. 106), and Plaintiff's Reply (ECF No. 107); and, (5) Defendants' Motion for Protective Order (ECF No. 110), Plaintiff's Opposition (ECF No. 112), and Defendants' Reply (ECF No. 113).[1]

## I.    RELEVANT BACKGROUND

Plaintiff Navajo Health Foundation – Sage Memorial Hospital, Inc. ("Sage Memorial") alleges Defendants Ahmad Razaghi ("Ahmad"), Tausif Hasan ("Hasan"), and Razaghi Development

---

[1]    The Court notes that many of Plaintiff's filings, including its 76-page proposed FAC, were not submitted in searchable Portable Document Formats ("PDF").  In the future, Plaintiff is instructed that electronically filed documents must be in a searchable PDF format.  *See* Local Rules LR IA 10-1(b) and LR IC 2-2(a)(1).

Company, LLC d/b/a Razaghi Healthcare ("RH")[2] engaged in a pattern of racketeering activity in concert with other individuals and entities that siphoned more than ten million dollars from Sage Memorial, a federally funded non-profit hospital serving an indigent Navajo Nation community in rural Ganado, Arizona.  The majority of the funds used to operate Sage Memorial come from the Indian Health Service (the "IHS"), an agency within the U.S. Department of Health and Human Services.  ECF No. 76-1 ¶ 24.  IHS is "obligated to fund Sage Memorial pursuant to binding treaty, statutory [sic], and contractual obligations the United States Government has assumed."  ECF No. 77 at 3, *citing Navajo Health Foundation-Sage Memorial Hosp., Inc. v. Burwell*, 263 F.Supp.3d 1083, 1118 (D. N.M. 2016) ("*Burwell*").

Pursuant to Sage Memorial's bylaws, every member of its Board of Directors (the "BOD") must be a member of the Navajo Nation and reside in the community in or around Ganado, Arizona. ECF No. 76-1 ¶ 21.  Sometime in 2007, Defendant "[Ahmad] and his brother partnered with a friend, Manuel Morgan ('Morgan'), a member of the Navajo Tribe and former Navajo Nation County Commissioner, to form Morgan & Associates, LLC, a company in which Morgan [held] majority ownership so that the entity could qualify as a Navajo business."  *Id*. ¶ 27.  Plaintiff alleges Ahmad, leveraging Morgan's status as a member of the Navajo Nation, persuaded Sage Memorial to award Morgan & Associates a management services contract for the hospital.  Under the terms of this contract, Ahmad would serve as Sage Memorial's "contract CEO."  *Id*. ¶ 28.  Plaintiff claims Ahmad subsequently created business entities, including RH, to supply Sage Memorial with medical personnel for a profit.

On March 18, 2011, RH entered into a management services contract with Sage Memorial's BOD.  This contract replaced Morgan & Associates' contract with the hospital and placed management of Sage Memorial under Ahmad and RH's control.  Plaintiff alleges that this was when the "multiple different schemes to defraud Sage Memorial began through the use of the mail and interstate wires."  *Id*. ¶ 30.

On or about May 17, 2013, Sage Memorial's BOD approved a "First Amendment" of the March 18, 2011 management services contract.  "Notably, . . . the [First Amendment to the] contract

---

[2]    Ahmad, Hasan, and RH are defined collectively as the "Razaghi Defendants."

provided that RH could hire, at Sage Memorial's expense, special counsel to represent . . . Sage Memorial . . . with respect to specific legal matters." *Id.* ¶ 31 (internal alterations and quotation marks omitted). Ahmad selected Stephen Hoffman ("Hoffman") to serve as Sage Memorial's special counsel. *Id.* ¶ 17. Around this time, non-party Stenson Wauneka ("Wauneka") served as Chairman of Sage Memorial's BOD. Plaintiff alleges Ahmad "developed a close and friendly relationship with Wauneka, meeting with him privately on numerous occasions . . . for which Wauneka would receive a financial benefit following each meeting in the form of an 'honorarium payment.'" *Id.* ¶ 31.

On October 16, 2014, a group of whistleblowers filed an amended complaint in the United States District Court for the District of Arizona, alleging Ahmad and others violated the False Claims Act (the "FCA"), 31 U.S.C. § 3729. Case No. 3:14-cv-8916-PCT-SRB. These whistleblowers alleged Ahmad "devised a massive scheme through which he abused his relationship with [Sage Memorial] to divert millions of dollars of federal funds provided by federal programs and contracts from Sage to himself" and others. ECF No. 76-1 ¶ 33. The whistleblowers voluntarily dismissed their FCA action around January 2017, after the United States declined to intervene.

Around the same time the whistleblower complaint was filed, the IHS advised Sage Memorial that the federal government would not be renewing its contracts with the hospital. On October 23, 2014, Sage Memorial sued the Secretary of the U.S. Department of Health and Human Services in the United States District Court for the District of New Mexico, challenging the IHS's decision to stop funding and alleging the federal government breached a number of prior contracts from 2009 through 2013. *Burwell*, 263 F.Supp.3d at 1083. On December 16, 2016, the United States agreed to pay $122,500,000 to settle the litigation with Sage Memorial. Plaintiff represents that the:

> settlement document memorializing the parties' agreement provided that payments must be used to fund Indian healthcare services, including ancillary services to the hospital or for any other legitimate healthcare purpose. However, the settlement agreement also expressly prohibited the hospital from providing payment to any management company or affiliated entity. Notably, the agreement also singled out [Ahmad] by name by further providing that "[i]f Ahmad R. Razaghi or any current officer or officer-level employee of a Razaghi-related entity is convicted of a felony crime of fraud related to the management of [the] [h]ospital or any federal health

1  care program operated by [the Hospital] within 5 years of the effective date of this
2  Settlement Agreement, IHS may conduct additional monitoring on the expenditure
   of the Settlement sum . . .."

3  ECF No. 76-1 ¶ 37.

4      On June 16, 2017, Ahmad called a BOD meeting at which Hoffman urged the BOD to

5  approve a "Second Amendment" to RH's management services contract. *Id*. ¶ 41. Plaintiff claims

6  that no BOD members, with the possible exception of Wauneka, was provided a copy of the

7  proposed Second Amendment prior to this meeting. Plaintiff further claims this omission was in

8  contravention of BOD rules and policies requiring members be provided with important documents

9  at least twenty-four hours in advance of a meeting so they can conduct meaningful review prior to

10 voting. Plaintiff maintains none of the BOD members has any formal legal training or knowledge

11 about contract interpretation and that many BOD members do not speak English as a first nor native

12 language.

13     Among other things, Section 5.D (the "termination payment provision") of the proposed

14 second amended contract "bestowed an extremely lucrative 'termination payment' upon [Ahmad]

15 in the event he terminated the contract or the Sage Board terminated it for any reason (including for

16 cause). These facts were inexplicably omitted from the Sage Board." *Id*. ¶ 42. In relevant part,

17 Section 5.D(2) of the termination payment provision states:

18     In the event that this Contract expires, or RH terminates this Contract for cause, or
       the Corporation elects to terminate this Contract at any time prior to expiration of
19     this Contract for any Reason other than those listed as "cause" in Section 4.A, the
       Corporation shall, in addition to any other amounts due under this Contract, pay
20     RH a Termination Payment in an amount equal to the average of the amount paid
       to RH by the Corporation each year during the most recent four years of service,
21     including the year of expiration or termination, which shall be prorated through the
       actual date of such expiration or termination.
22

23 *Id*. ¶ 43 (internal alterations omitted). In addition to the termination payment provision, the proposed

24 second amendment proposed an increase of Ahmad's base hourly compensation from $175 per hour

25 to $495 per hour, and stated that the contract would become effective retroactively to one year earlier

26 on July 6, 2016. *Id*. ¶ 44. Plaintiff alleges Hoffman "urged" the BOD approve the second

27 amendment without discussing the termination payment provision or the increase in Ahmad's base

28

1  hourly rate. *Id*. ¶¶ 41-44. The BOD thereafter approved the Second Amendment. *Id*. at 44. Ahmad,

2  and Wauneka in his capacity as the BOD Chairman, then signed the contract. *Id*.

3       On July 11, 2018, Nicole Hardy ("Hardy"), a non-party to this action and an accounts

4  specialist in Sage Memorial's finance department, received an email request from Ahmad conveyed

5  through Tom Matenaer ("Matenaer"), Sage Memorial's Controller, to produce a "cost report" for

6  the period 2014 through 2017. *Id*. ¶ 47. On July 16, 2018, Hardy emailed the cost report to Matenaer

7  and Sage Memorial's staff accountant, Mary Arave ("Arave"). *Id*. ¶ 48.

8       On July 18, 2018, Ahmad contacted Sage Memorial's contract CEO Christi El-Meligi

9  ("CEM") and Chief Operating Officer Netrisha Dalgai ("Dalgai") to tell them they were "doing a

10  great job." *Id*. ¶ 49. On July 19, 2018, CEM held a meeting with Matenaer and Sage Memorial's

11  human resources director to discuss the hospital's obligations to comply with Navajo Nation

12  preferences in employment laws and issues related to the finance department. *Id*. ¶ 50. On July 20,

13  2018, Ahmad circulated an email advising Sage Memorial staff that CEM would be "re-assigned

14  and . . . removed" from her position. *Id*. ¶ 51 (internal quotation marks omitted). That same day,

15  BOD member Ray Ann Terry emailed her fellow board members to request a special meeting to

16  discuss her concerns with the RH's management services contract and CEM's

17  reassignment/removal.

18       On July 23, 2018, the BOD convened a special meeting to discuss retaining independent

19  counsel to review RH's twice-amended management services contract. *Id*. ¶ 52. The BOD decided

20  that this independent counsel should not be someone appointed by Ahmad. *Id*. Ahmad strongly

21  objected to this decision and requested a copy of the current Sage Memorial bylaws and conflict of

22  interest policies over email. *Id*. Notwithstanding Ahmad's protests, the BOD engaged Jeff Davis

23  ("Davis") of Barnes & Thornburg, LLP to review the amended management contract and Ahmad's

24  relationship with Sage Memorial. *Id*. Sometime thereafter, Ahmad held an emergency meeting with

25  the RH management staff. Razaghi invited Wauneka to attend this meeting, but declined to invite

26  the majority of the other BOD members. *Id*. ¶ 53.

27       On August 2, 2018, RH and Ahmad's counsel mailed and emailed a letter to Wauneka

28  advising him of the BOD's alleged "prospective breaches and/or interference" with the management

contract.  *Id.* ¶ 54.  In support of their assertions, Defendants' letter maintains "unauthorized communications and actions between certain Board members and [CEM] and [Dalgai] . . . amounted to contract interference and a material breach of the [management] contract."  *Id.* (internal quotation marks omitted).  This mailed and emailed letter also states that "any attempt by the Board to cause the Contract to expire or terminate early will result in [Sage Memorial's] immediate obligation to pay the Termination Payment to RH in accordance with the Contract, which will be several million dollars."  *Id.* (internal quotation marks omitted).  Plaintiff notes that RH's management services contract provides Sage Memorial with a thirty-day cure period in the event of a breach, a fact which allegedly went unmentioned in this letter.  *Id.*  Accordingly, Plaintiff asserts that to the extent this August 2, 2018 letter served as notification of the BOD's prospective breach, the BOD would have had until September 2, 2018 to cure that breach under the terms of the management services contract.  *Id.*

On August 13, 2018, Wauneka emailed Davis and two other BOD members, copying Ahmad on the message, stating: "I believe we are at a point in time where the question is whether the Board wants to continue its relation with Razaghi Development Company, LLC."  *Id.* ¶ 55.  Davis responded to this email by writing, in part:

> I would respectfully disagree with your statement that the Board is [at] a point where the question is whether the Board wants to continue its relationship with Razaghi Development Company.  Quite the contrary, I have had the pleasure of talking with other Board members and they are ready and willing to work with all and invigorate the Board so that it is an equal partner in insuring that members of the Navajo Nation are provided services by Sage Memorial Hospital received the best possible medical treatment and programs at a cost-efficient medical facility.

*Id.*  On August 20, 2018, the BOD held an executive session meeting with Davis and Sage Memorial's independent financial auditor Heather Grech ("Grech").  *Id.* ¶ 56.  The BOD, Davis, and Grech discussed the management services contract, payments made to RH, and the decision to not approve an incentive bonus for Ahmad that year.  *Id.*

On August 27, 2018, Hardy received a telephone call from Defendant Chief Financial Officer Hasan requesting status and payment of three invoices sent earlier that morning.  *Id.* ¶ 57(a).  Hardy reviewed the three invoices totaling $11,048,517.71.  One of the three invoices, Invoice #1369, referenced a "Contract Termination Fee, Section 5.D" of $10,855,134.15.  *Id.* ¶ 57(b).  The only

supporting document attached to this Invoice was Hardy's July 16, 2018 cost report. Apprehensive about inputting an invoice for such a large amount, Hardy discussed appropriate next steps with her supervisor Arave and Arave's supervisor, Matenaer. Matenaer said he would speak to Hasan about the matter. When Hardy returned to her desk after taking a break, she noticed that Matenaer had emailed Hasan about Invoice #1369. *Id*. ¶ 57(c). Hardy also saw that Hasan had left her a voice message instructing her to call him back immediately. *Id*. "Upon returning his call, Hardy was ordered by Hasan to immediately input the invoices into the system for payment and to code the payment for [I]nvoice #1369 as 'Management Services Fees.'" *Id*. Hardy complied and uploaded the Invoice into Sage Memorial's payment system. Thereafter, Hasan purportedly accessed Sage Memorial's system to transfer $500,000.00 from Sage Memorial's IHS Funding Account and $10,855,00.00 from the hospital's Third-Party Revenue Account to Sage Memorials' General Operating Account to cover the $10.8 million invoice. *Id*. ¶ 57(f). Hasan then approved the $10.8 million payment to RH.

On August 29, 2018, Ahmad sent a physical letter addressed to the BOD expressing his "concerns over the state of the Board of Directors," and notified the BOD that Davis has "no authority [to] represent Navajo Sage [Memorial Hospital] under governing Navajo law and will not be paid." *Id*. ¶ 58. This letter did not disclose that Ahmad had withdrawn more than $10 million from Sage Memorial's Operating Account two days prior.

Ahmad and RH continued to send invoices to Sage Memorial by "electronic mail" for services rendered including, but not limited to:

- September 11, 2018 (invoice #1370) in the amount of $31,678.32 for credit card, legal and executive leadership services;

- September 6, 2018 (invoice #1371) in the amount of $74,448.08 for management incentive services fee;

- September 6, 2018 (invoice #1372) in the amount of $129,986.76 for management consulting services;

- September 6, 2018 (invoice #1373) in the amount of $106,120.38 for executive leadership, legal and professional services;

- October 4, 2018 (invoice #1374) in the amount of $156,694.93 for management consulting services (with interest charges);

- November 1, 2018 (invoice #1382) in the amount of $129,331.55 for management consulting services (with interest charges);

- November 27, 2018 (invoice #1383) in the amount of $511.395.11 for management consulting services for "transition period" (with interest charges);

- December 1, 2018 (invoice #1384) in the amount of $443,996.71 (with interest charges) for "legal and professional expenses[]"[; and,]

- January 2, 2019 (invoice #1385) in the amount of $235,873.85 (with interest charge[s]) for "management consulting services" and "incentive fees[.]"

*Id.* ¶ 59.

Sage Memorial's operative Complaint seeks treble damages for injuries to its business and property allegedly caused by the Razaghi Defendants' racketeering activity in violation of the federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), companion Nevada racketeering statutes, and various state common law claims. Plaintiff also seeks declaratory and injunctive relief.

## II.    DISCUSSION

### A.    Defendants' Motion To Stay Discovery (ECF No. 56) Is Granted.

#### 1.    Reconsideration of the Court's prior Order (ECF No. 52) is not warranted.

The Ninth Circuit has limited the grounds for reconsideration into three primary categories: (1) newly discovered evidence, (2) the need to correct clear error or prevent manifest injustice, or (3) an intervening change in controlling law. *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001). Generally, a "motion for reconsideration should not be granted, absent highly unusual circumstances." *Carroll v. Nakatoni*, 342 F.3d 934, 945 (9th Cir. 2003). It is also well established that a motion for reconsideration "may *not* be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Marylyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009) (internal citation omitted) (emphasis in original).

On July 6, 2020, the Court issued an Order denying the parties' Joint Stipulation to Extend Time to File a Discovery Plan and for Stay of Discovery. ECF No. 52. Two days later, Defendants filed the instant Motion to Stay Discovery and/or Reconsideration of Order Denying Stipulation to Stay Discovery. ECF No. 56. Defendants maintain a discovery stay is appropriate because they have filed a dispositive motion seeking dismissal of Plaintiff's claims, alleging lack of subject matter

jurisdiction and failure to state claims upon which relief can be granted.  *Id*. at 2; *see also* ECF No. 46 (Defendants' Motion to Dismiss filed on June 5, 2020).  Defendants, however, do not explain why they did not raise these arguments in detail in the Joint Stipulation filed on July 2, 2020, which merely states that "the parties . . . believe a stay of discovery . . . will promote litigation efficiency by allowing the parties to focus upon the dispositive motion [ECF No. 46] pending before the Court without incurring costs and fees engaging in discovery at the same time."  ECF No. 51 at 2. Defendants therefore "fail[] to demonstrate how [their] assertions constitute 'newly discovered evidence' for purposes of reconsideration."  *Hupe v. Mani*, Case No. 2:16-cv-00533-GMN-VCF, 2017 WL 1128598, at \*1 (D. Nev. Mar. 24, 2017).  There was no error of law or fact in the Court's determinations, there was no intervening change in the law, and Defendants present no newly discovered evidence.  For these reasons, the Court denies Defendants' Motion for Reconsideration of Order Denying Stipulation to Stay Discovery.

2.    A stay of discovery pending resolution of Defendants' Motion to Dismiss (ECF No. 46) is appropriate.

In the alternative, Defendants filed a Motion to Stay Discovery.  Generally, a dispositive motion, including Defendants' Motion to Dismiss (*id*.), does not warrant a stay of discovery. *Tradebay, LLC v. eBay, Inc.*, 278 F.R.D. 597, 601 (D. Nev. 2011).  "The party seeking a stay . . . has the burden to show good cause by demonstrating harm or prejudice that will result from the discovery."  *Rosenstein v. Clark Cnty. Sch. Dist.*, Case No. 2:13-cv-1443-JCM-VCF, 2014 WL 2835074, at \*3 (D. Nev. June 23, 2014), *citing* Fed. R. Civ. P. 26(c)(1) (internal quotation marks omitted).  Under certain circumstances it is an abuse of discretion to deny discovery while a dispositive motion is pending (*Tradebay, LLC*, 278 F.R.D. at 602) and, for this reason, a party seeking a stay of discovery carries the heavy burden of making a strong showing why the discovery process should be halted.  *Turner Broad. Sys., Inc. v. Tracinda Corp.*, 175 F.R.D. 554, 556 (D. Nev. 1997).  When deciding whether to issue a stay, a court must take a "preliminary peek" at the merits of the dispositive motion pending in the case.  *Buckwalter v. Nev. Bd. of Med. Exam'rs*, Case No. 2:10-cv-02034-KJD-GWF, 2011 WL 841391, at \*1 (D. Nev. Mar. 7, 2011).  In doing so, the Court

1    must consider whether the pending motion is potentially dispositive of the entire case, and whether

2    that motion can be decided without additional discovery. *Tradebay*, 278 F.R.D. at 602.

3          Moreover, the Court adopts a standard when reviewing the merits of a dispositive motion

4    that best effectuates Fed. R. Civ. P. 1's objective for the "just, speedy, and inexpensive"

5    determination of actions. *Id.* at 602-03. Even if discovery will involve inconvenience and expense,

6    this is insufficient, without more, to support a stay of discovery. *Turner Broad. Sys., Inc.*, 175 F.R.D.

7    at 556. Motions to dismiss are frequently part of federal practice and "[a]n overly lenient standard

8    for granting motions to stay all discovery is likely to result in unnecessary discovery delay in many

9    cases." *Trzaska v. Int'l Game Tech.*, Case No. 2:10-cv-02268-JCM-GWF, 2011 WL 1233298, at *4

10    (D. Nev. Mar. 29, 2011).

11          Here, a preliminary peek at Defendants' pending Motion to Dismiss (ECF No. 46)

12    demonstrates a likelihood of success with respect to Defendants' argument that Plaintiff fails to plead

13    its federal civil RICO and civil RICO conspiracy claims, as well as its Nevada civil RICO and civil

14    RICO conspiracy claims, with particularity. The Court also finds that Defendants' Motion on this,

15    and all other issues presented, can be decided without discovery. Allowing the Motion to Dismiss

16    to proceed to conclusion, together with the potential that Plaintiff will file an amended complaint

17    (discussed below), establishes an appropriate basis to stay discovery. Further, because discovery is

18    stayed, the Court denies Defendants' Motion for Protective Order to Limit Subpoenas Served by

19    Plaintiff (ECF No. 72), Plaintiff's Motion to Compel Production of Documents (ECF No. 98), and

20    Defendants' Motion for Protective Order (ECF No. 110) without prejudice as moot.

21        **B.**     **The Court Recommends Denying Plaintiff's Motion For Leave To File FAC**

22                 **Without Prejudice, With Leave To Amend**.

23          Fed. R. Civ. P. 15(a)(2) provides that "leave shall be freely given when justice so requires."

24    *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (internal quotation marks omitted).

25    "Generally, this determination should be performed with all inferences in favor of granting the

26    motion." *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999) (internal citation omitted).

27    In the Ninth Circuit, Rule 15(a) is applied with "extreme liberality." *Eminence Capital, LLC v.*

28

1    *Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (per curiam).  Nonetheless, it is within the district

2    court's discretion to determine whether to grant leave to amend.  *Chappel v. Lab. Corp. of Am.*, 232

3    F.3d 719, 725 (9th Cir. 2000).

4    Courts consider various factors when determining whether to grant leave to amend,

5    including: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of

6    amendment, and (5) whether the plaintiff has previously amended its complaint.  *Eminence Capital,*

7    *LLC*, 316 F.3d at 1052.  When the Court exercises its discretion, it "must be guided by the underlying

8    purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities."

9    *U.S. v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981) (internal citation omitted).  Here, Defendants

10   concede that they "oppose Plaintiff's request for leave to amend the Complaint on the sole ground

11   that such amendment would be futile."  ECF No. 88 at 1-2.  The Court therefore focuses its analysis

12   on whether Plaintiff's proposed amendments are indeed futile.

13   "[I]f no set of facts can be proved under the amendment to the pleadings that would constitute

14   a valid and sufficient claim or defense," a proposed amendment is futile.  *Farina v. Compuware*

15   *Corp.*, 256 F.Supp.2d, 1033, 1061 (9th Cir. 2003) (internal citation omitted).  Although futility alone

16   can justify denying a motion for leave to amend (*Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir.

17   2004)), "denial on this ground is rare and courts generally defer consideration of challenges to the

18   merits of a proposed amended pleading until after leave to amend is granted and the amended

19   pleading is filed."  *Cates v. Stroud*, Case No. 2:17-cv-01080-GMN-PAL, 2017 WL 11429893, at *2

20   (D. Nev. Oct. 26, 2017) (internal citations omitted).  Keeping these holdings in mind, the Court

21   addresses whether the claims presented in Plaintiff's proposed amended complaint are futile.

22       1.   <u>At the pleadings stage of proceedings, Plaintiff's allegations based on</u>

23   <u>electronic and physical mail communications establish the interstate</u>
     <u>requirement of a federal civil RICO claim, but Plaintiff's allegations based on</u>

24   <u>telephone communications do not.</u>

25       i.   *Allegations of email communications transmitted in interstate*
     *commerce are sufficient to establish the interstate requirement of a*

26   *federal civil RICO claim.*

27   Plaintiff's proposed FAC avers that this "Court has federal question jurisdiction . . . because

28   this action arises under [RICO], 18 U.S.C. § 1961 *et. seq*."  ECF No. 76-1 at 4.  Chapter 18 of the

United States Code, § 1962(c), creates a private right of action for federal civil RICO claims.  Section 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To find a violation of Section 1962(c), the trier of fact must conclude that a person (1) engaged in "conduct (2) of an enterprise [by which the person is employed or with which he associated] (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  A plaintiff "must, of course, allege each of these elements to state a claim." *Id.* "[R]acketeering activity" is defined as "any act which is indictable" under specified provisions of Title 18 of the United States Code, including mail fraud, wire fraud, and bank fraud.  18 U.S.C. § 1961(1)(B).

Plaintiff's proposed FAC sufficiently alleges Defendants engaged in the predicate acts of wire fraud (18 U.S.C. § 1343) for purposes of racketeering:

- "Defendants caused Razaghi Healthcare to transmit Monthly Invoice[s] . . . to Sage Memorial by email" on June 1, 2017 (ECF No. 76-1 ¶ 85(a)(i)); June 29, 2017 (*id*. ¶ 85(b)(i)); July 13, 2017 (*id*. ¶ 85(c)(i)); August 9, 2017 (*id*. ¶ 85(d)(i)); August 11, 2017 (*id*. ¶ 85(e)(i)); August 24, 2017 (*id*. ¶ 85(f)(i)); September 7, 2017 (*id*. ¶ 85(g)(i)); September 25, 2017 (*id*. ¶ 85(h)(i)); September 29, 2017 (*id*. ¶ 85(i)(i)); October 16, 2017 (*id*. ¶¶ 85(k)(i) and (m)(i)); October 20, 2017 (*id*. ¶¶ 85(j)(i) and (l)(i)); November 1, 2017 (*id*. ¶¶ 85(n)(i) and (o)(i)); November 20, 2017 (*id*. ¶¶ 85(p)(i), (q)(i), and (r)(i)); February 14, 2018 (*id*. ¶ 85(s)(i)); and, February 26, 2018 (*id*. ¶ 85(t)(i));

- On July 11, 2018, non-party Hardy "received an email request from [Defendant Ahmad] Razaghi conveyed through . . . the hospital's Controller[] to produce a 'cost report' for the period 2014 through 2017" (*id*. ¶¶ 47, 87(a));

- On July 20, 2018, Ahmad "circulated an email informing staff that CEM was to be 're-assigned and . . . removed' from her position at Sage" (*id*. ¶¶ 51, 87(c));

- On July 23, 2018, Ahmad objected to the BOD's decision to retain independent counsel to review the RH management counsel "via email" (*id*. ¶¶ 52, 87(d));

- On August 2, 2018, Ahmad emailed non-party Wauneka notifying him of "prospective breaches and/or interference" with Sage's management contract (*id*. ¶¶ 54, 87(e));

- On or about August 27, 2018, Hasan directed Hardy over the phone to process an invoice of $10,855,134.15 to RH (*id*. ¶ 87(g));

- On or about August 29, 2018, Ahmad emailed the BOD expressing his concerns over the BOD and its representation agreement with independent counsel (*id.* ¶¶ 58, 87(h)); and,

- "From September 11, 2018 through the present, Defendant[s] used the interstate wires to e-mail invoices to Plaintiff demanding payment of over $1.8 million for fictious services." (*id.* ¶ 89; *see also* ¶ 59).

Despite Plaintiff's failure to allege that the emails constituting wire fraud were sent among individuals physically located in different states, Plaintiff sufficiently alleges that email communications were transmitted in interstate commerce (*id.* ¶ 75), which is sufficient "at the pleadings stage" to survive dismissal. *Bryant v. Mattel, Inc.*, 573 F.Supp.2d 1254, 1265 (C.D. Cal. 2007) (plaintiff "alleged that the communications were transmitted in interstate or foreign commerce. . . . This suffices at the pleadings stage" to meet the basic pleading requirements of 18 U.S.C. § 1343); *Brice v. Hoffert*, Case No. 5:15-cv-4020, 2016 WL 4766301, at *4 (E.D. Pa. Sept. 13, 2016) (internal citations omitted) (in the context of a civil RICO claim, "emails sent over the Internet satisfy the interstate commerce element without proof that they actually crossed state lines."), *reversed and remanded on other grounds by Brice v. Bauer*, 689 Fed. App'x 122 (3d Cir. 2017).[3]

> ii.   *Allegations of mail traveling in interstate commerce are sufficient to establish the interstate requirement of a federal civil RICO claim.*

Plaintiff's proposed FAC sufficiently alleges mail fraud to establish the interstate requirement of the federal civil RICO statute.  Plaintiff alleges four mail fraud allegations:

- "By letter dated August 2, 2018 (mailed . . . that same day), counsel for RH and Razaghi (Christopher Stachowiak) wrote to Board Chair Wauneka . . . notifying

---

[3]    The Court recognizes there are cases to the contrary such as *Perseverance MED, LLC v. Trujillo*, Case No. 18-cv-02719-CMA-KMT, 2019 WL 5095718, at *6 (D. Colo. Aug. 15, 2019) and *Dewitt Ins., Inc. v. Horton*, Case No. 4:13-CV-2585 JAR, 2014 WL 2208073, at *5-6 (E.D. Mo. May 28, 2014).  However, as stated above, at least one court in the Ninth Circuit explains proof that emails crossed state lines is something Plaintiffs will need to demonstrate with evidence at summary judgment or trial, and not at the pleading stage of proceedings.  *Bryant*, 573 F.Supp.2d at 1265.  The Court also notes that Plaintiff's citations to *U.S. v. Siembida*, 604 F.Supp.2d 589, 596 (S.D.N.Y. 2008), and *U.S. v. Laedeke*, Case No. CR 16-33-BLG-SPW, 2016 WL 5390106 (D. Mont. Sept. 26, 2016), are distinguishable.  In *Siembida*, evidence was produced at trial showing the email system used by Siembida would have crossed state lines. 604 F.Supp.2d at 596.  In *Laedeke*, it was undisputed that "[a]lthough [defendant] . . . exchanged . . . emails in Montana, the emails traveled interstate to an email server in either New Jersey or New York."  2016 WL 5390106 at *1.  Plaintiff's currently proposed FAC does not include specific facts of the nature cited in these cases; although, such information may now be available.  Whether such facts may be alleged will depend upon the outcome of the Motion to Dismiss and whether the Court allows Plaintiff leave to file a proposed second amended complaint.

him of 'prospective breaches and/or interference' with the management contract with Sage." (ECF No. 76-1 ¶ 54);

- On August 29, 2018, Defendant Ahmad "sent a letter" to Sage Memorial's BOD "expressing his 'concerns over the state of the [BOD]' and 'an invalid purported agreement with [the independent counsel, Davis]" (*id*. ¶ 58);

- "On or about September 1, 2018, RH attorney Stachowiak mailed a letter to Sage notifying it of the termination of the second amended CEO services contract." (*id*. ¶ 87(i)); and,

- "On or about September 4, 2018, RH attorney Stachowiak mailed a second letter to the Sage Board's containing misrepresentations regarding the RH termination." (*id*. ¶ 87(j)).

These allegations are sufficient at the pleading stage to meet Rule 9(b)'s heightened pleading requirements for mail fraud. That is, Plaintiff's FAC "describes the dates on which the letters were written, by whom and to whom the letters were sent, the letters' content, and the letters' role in the fraudulent scheme." *Sun Sav. and Loan Ass'n v. Dierdorff*, 825 F.2d 187, 196 (9th Cir. 1987). Further, Plaintiff alleges Defendant participated in a fraudulent scheme "involving use of United States . . . mail" to meet the interstate requirement of a federal civil RICO mail fraud claim. *Donovan v. Flamingo Palms Villas, LLC*, Case No. 2:08-cv-01675-RCJ-RJJ, 2009 WL 10693815, at *12 (D. Nev. Dec. 15, 2009).

　　　　　　　　　　iii.　*As pleaded, Plaintiff's telephone allegations likely fail to establish the interstate requirement of a federal civil RICO claim, but the Court recommends leave to amend.*

In contrast, Plaintiff's allegations regarding three telephone communications fail to establish interstate wire communications necessary to state a federal civil RICO claim. The first call was a "telephone conference call" that took place on August 20, 2018 between non-parties (BOD members, independent counsel, and Sage Memorial's financial auditor), which do not establish any of the Defendants' participation in the alleged racketeering activity. ECF No. 76-1 ¶ 56. The second and third calls both took place on August 27, 2018. *Id*. ¶¶ 57(a), (c). Plaintiff alleges Hardy received the second call and made the third call while she was working at Sage Memorial Hospital in Arizona, and does not allege where Hasan was at the time of these calls. However, Plaintiff generally alleges that "Hasan is a resident of Arizona." *Id*. ¶ 10. As stated by numerous courts, "no allegation that the jurisdictional prerequisite for invocation of the wire fraud statute has been satisfied" where the

dialer and receiver of a telephone call were residents of the same state, because the "federal wire fraud statute does not cover telephone communications between persons within the same state." *McCoy v. Goldberg*, 748 F.Supp. 146, 154 (S.D.N.Y. 1990) (internal citations omitted); *see also Mattel, Inc. v. MGA Ent., Inc.*, 782 F.Supp.2d 911, 1026 (C.D. Cal. 2011) (phone calls made between California residents were "intrastate communications" outside the reach of the wire fraud statute); *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 243 (2d Cir. 1999) ("Purely intrastate communication is beyond the [wire fraud] statute's reach.") (internal brackets and quotation marks omitted); *Harris Tr. and Sav. Bank v. Ellis*, 609 F.Supp. 1118, 1122 (N.D. Ill. 1985), *aff'd*, 810 F.2d 700 (7th Cir. 1987) (finding wire fraud allegations "deficient" as the plaintiff's "amended complaint fail[ed] to allege any use of interstate wires, and given the Illinois residence of all the parties it would not be reasonable to infer that any such use occurred."). Given that Plaintiff alleges Hardy was working in Arizona at the time of the relevant calls and that Hasan is an Arizona resident, the telephone calls between them are "presumed to be intrastate and, absent any indication otherwise, the predicate act of wire fraud is not stated." *McCoy*, 748 F.Supp. at 154.

As pleaded, Plaintiff's telephone allegations in its proposed FAC likely fail to satisfy the interstate requirement of the federal civil RICO statute. However, "[a]bsent prejudice, or a strong showing of any of the remaining . . . factors" the Court considers when deciding whether to grant leave to amend, "there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC*, 316 F.3d at 1052 (internal citation and emphasis omitted). Further, the policy that "leave shall be freely given when justice so requires . . . is to be applied with extreme liberality" in this Circuit. *Id*. at 1051 (internal citation and quotation marks omitted). Based on this presumption and policy, the Court recommends granting Plaintiff leave to amend to correct the above deficiencies in its telephone allegations.

### C. The Court recommends granting Plaintiff leave to amend to replead its federal civil RICO conspiracy claim with sufficient particularity.

"To support the mail and wire fraud allegations, the plaintiff[] must plausibly allege the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and that defendants communicated, or caused communications to occur,

through the U.S. mail or interstate wires to execute that fraudulent scheme." *Albers v. Yarbrough World Solutions, LLC*, Case No. 5:19-cv-05896-EJD, 2020 WL 6064334, at *4 (N.D. Cal. Oct. 14, 2020) (internal brackets and quotation marks omitted). Because Fed. R. Civ. P. 9(b) requires a plaintiff to plead mail and wire fraud allegations with particularity, a plaintiff must set forth, with detail, the time, place, and contents of the alleged false representations. *Id*.; *see also Byrant*, 573 F.Supp.2d at 1264 (the predicate acts underlying mail or wire fraud must be pleaded with particularity including "detail[ing] the time, place, and manner of each act of fraud, and it must set forth the role of each defendant in each scheme.") (internal citations and brackets omitted); *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1400-01 (9th Cir. 1986) (Rule 9(b) requires plaintiff to plead the circumstances constituting fraud with particularity, including the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation.") (internal citations and quotation marks omitted).

With respect to each defendant's role in furtherance of a wire or mail fraud scheme, the allegations must also meet Fed. R. Civ. P. 9(b). *Bryant*, 573 F.Supp.2d. at 1265 (internal citation omitted). "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (internal citation and quotation marks omitted). "However, the Court will view the communications alleged to constitute mail and wire fraud in conjunction with all the allegations set forth regarding the alleged scheme in the" complaint. *Bryant*, 573 F.Supp.2d at 1256.

The Court finds Plaintiff's proposed FAC fails to allege the predicate acts underlying the alleged fraudulent scheme with sufficient particularity. However, because this pleading failure is potentially remedied and does not render the action before the Court futile, the Court recommends Plaintiff's Motion for Leave to File First Amended Complaint (ECF No. 76) be denied without prejudice, with leave to amend.

Plaintiff alleges in its proposed FAC that the Razaghi Defendants violated RICO by charging an illegal termination fee and committing "Invoice Fraud Acts," some of which are alleged to

continue onto the present day. ECF No. 76-1 ¶¶ 62-99. The wrongful termination fee is the only allegation of racketeering activity that meets the heightened pleading requirements of Rule 9(b). That is, Plaintiff specifically alleges that Defendant Hasan ordered Sage Memorial's account specialist to upload the $10.8 million Invoice onto RH's payment system, and that Hasan approved said payment to Defendant RH. *Id.* ¶ 87.

In contrast, Plaintiff repeatedly attributes the alleged Invoice Fraud Acts and attempts to defraud from September 11, 2018 through the present day to "Defendant" or "Defendants":

- "Defendants used Razaghi Healthcare's role as Contract CEO . . . to improperly and illegally obtain money from Sage Memorial" (ECF No. 76-1 ¶ 76);

- "Defendants concealed the Fraudulent Expenses in voluminous invoices submitted monthly by [RH] to Sage Memorial" (*id.* ¶ 77);

- "Defendants . . . began separating the Monthly Invoices into multiple invoices" (*id.* ¶ 78);

- "Defendants knew they would wrongfully and illegally obtain money and property from Sage Memorial" (*id.* ¶ 79);

- "As a result of the Defendants' complete control, Sage Memorial did not have the ability to meaningful[ly] review the Monthly Invoices" (*id.* ¶ 80);

- "Defendants carried out, facilitated, and concealed the Scheme and Artifice to Defraud and the Pattern of Racketeering Activity" (*id.* ¶ 81);

- "Defendants used the money and property obtained from their Racketeering Activity to enrich themselves and to expand the Enterprise" (*id.* ¶ 82);

- "Defendants took the following actions in furtherance of their effort[s] to expand the Enterprise and to increase the scope of their Racketeering Activity" (*id.* ¶ 83);

- "Defendants billed to, and received payment from, Sage Memorial for the activities undertaken for the purpose of expanding the Enterprise" (*id.* ¶ 84);

- "Defendants [submitted] lengthy invoices to Sage Memorial [seeking] payment for Fraudulent Expenses" (*id.* ¶ 85);

- "Defendant used the interstate wires to e-mail invoices to Plaintiff demanding payment of over $1.8 million for fictious services. . . . [C]ontinuing through this day, Defendants . . . continued to attempt to defraud Sage Memorial through the e-mailing of invoices" (*id.* ¶ 89); and,

- "Defendants continued to bill Sage [Memorial] for $1.8 million for 'management fees' even after their termination and continue to bill for fictitious services to this day." (*id.* ¶ 92).

1    This lack of specificity prevents Defendants from preparing an "adequate answer" to the allegations.

2    *Schreiber Distrib. Co.*, 806 F.2d at 1400 (internal citations and quotation marks omitted).  This is

3    especially concerning as "Plaintiff alleges the invoice fraud occurred . . . through the present, but . .

4    . [Defendant] Hasan was not employed or otherwise working for [RH] or Sage from September 2017

5    through December 2017, and again after August 2018."  ECF No. 88 at 7 (internal alteration

6    omitted).  Thus, the Court finds Plaintiff insufficiently attributes the specific roles any particular

7    "Defendant" and/or "Defendants" are alleged to have played in the alleged Invoice Fraud Acts and

8    the subsequent attempts to defraud from September 11, 2018 through the present day.  However, the

9    Court acknowledges that denial of a motion for leave to amend based on futility is "rare," and that

10   this is not a case in which Plaintiff has repeatedly failed to conform to the requirements of Rule 9(b).

11   *Cates*, 2017 WL 11429893, at *2.  Because Plaintiff's insufficient pleading is potentially remedied

12   through the addition of factual allegations, the Court recommends Plaintiff's Motion for Leave to

13   File First Amended Complaint be denied without prejudice, with leave to amend.

14              3.    Defendants' standing arguments are likely to fail as to each of Plaintiff's
                     claims except the Nevada civil RICO and civil RICO conspiracy claims.
15

16         Standing to bring suit is an indispensable part of a federal court's Article III jurisdiction and

17   must be addressed by the Court before reaching the merits of a case even when the issue is not raised

18   by the parties.  *Lujan v. Defenders of Wildlife*, 504 U.S. 550, 560 (1992).  To establish the

19   "irreducible constitutional minimum" of Article III standing, each plaintiff must demonstrate: (1) it

20   has suffered "injury in fact"; (2) a causal connection between that injury and the defendants' conduct;

21   and, (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

22   decision.  *Id*. at 560-61.  An injury in fact is an "invasion of a legally protected interest which is (a)

23   concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Id*. at 560.

24         In its Opposition to Plaintiff's Motion for Leave to File a FAC, Defendants assert that each

25   of Plaintiff's claims in its proposed FAC fail for lack of standing or are subject to dismissal as they

26   are improperly pleaded.  ECF No. 88 at 4-20.  Defendants' standing arguments are likely to fail with

27   respect to each of Plaintiff's claims, except Plaintiff's Nevada RICO claims.

28

1

2

> i.    *The federal civil RICO and civil RICO conspiracy against Defendants Ahmad and Hasan*

3    Standing to bring a civil RICO suit requires a plaintiff to show that its "alleged harm qualifies

4  as injury to his business or property; and (2) that [its] harm was 'by reason of' the RICO violation,

5  which requires the plaintiff to establish proximate causation." *Holmes v. SEC Investor Prot. Corp.*,

6  503 U.S. 258, 268 (1992).  Defendants contend Plaintiff fails to demonstrate an injury because Sage

7  Memorial's alleged damages are "limited to the hypothetical, speculative damage caused by the

8  alleged early transfer of the funds, but cannot include the entire termination fee itself, which was

9  irrefutably otherwise due under the operable contract."  ECF No. 88 at 10.  Defendants misinterpret

10  Plaintiff's allegations.  There is no indication that Plaintiff seeks only to challenge the *early* transfer

11  of funds.  Rather, Plaintiff's FAC details the Razaghi Defendants' purported scheme to defraud Sage

12  Memorial through their monthly invoices (ECF No. 76-1 ¶¶ 76-85), the $10.8 million termination

13  fee (*id*. ¶¶ 86-88), and email invoices for fictitious services rendered from September 11, 2018

14  through the present day (*id*. ¶ 89).  "[C]oncrete financial loss[es]" such as these constitute actual,

15  concrete injuries that Sage Memorial alleges it suffered as a result of Defendants Ahmad and Hasan's

16  fraud.  *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008) (internal citation

17  omitted).

18    "Financial loss alone, however, is insufficient.  Without a harm to a specific business or

19  property interest—a categorical inquiry typically determined by reference to state law—there is no

20  injury to business or property within the meaning of RICO."  *Id*. (internal citation and quotation

21  marks omitted).  To that end, the Ninth Circuit holds that the "legal entitlement to business relations

22  unhampered by schemes prohibited by the RICO predicate statutes" constitutes such a property

23  interest, and that this property interest is sufficient to provide standing under RICO.  *Mendoza v.*

24  *Zirkle Fruit Co.*, 301 F.3d 1163, 1168, 1168 n.4 (9th Cir. 2002).  Here, Plaintiff not only alleges

25  concrete financial loss as described above, but it also alleges Defendant Ahmad, *inter alia*,

26  intentionally interfered with its contractual and business relations, an established tort under Arizona

27  law (*Barrow v. Arizona Bd. of Regents*, 761 P.2d 145, 152 (Ariz. Ct. App. 1988)), by conspiring

28  with Defendant Hasan to fraudulently withdraw $10.8 million from Sage Memorial's bank account,

thereby inviting "scrutiny from federal authorities which have, upon information and belief, beg[u]n an inquiry/investigation into the conduct at issue in this lawsuit" and "plac[ing] in jeopardy the agreement between Sage Memorial and the United States of America."  ECF No. 76-1 ¶¶ 140-41; *see also id*. ¶¶ 87(g).  At this pleadings stage, Plaintiff's proposed FAC adequately alleges injury to its business or property within the meaning of RICO that establishes Plaintiff's standing.

Defendants assert Plaintiff fails to state a federal civil RICO conspiracy claim, because it lacks standing to bring a federal civil RICO claim.  ECF No. 88 at 12, *citing Jung Hyun Cho v. Select Portfolio Serv., Inc.*, 802 Fed.App'x. 230, 2020 WL 1929128, at *1 (9th Cir. Apr. 21, 2020) ("to plead a RICO conspiracy claim under § 1962(d), the plaintiff must first adequately plead a substantive violation of RICO.") (internal citations omitted) (unpublished).  Because the Court finds Plaintiff has standing to bring its federal civil RICO claim, Defendants' argument regarding Plaintiff's civil RICO conspiracy claims are without merit.

> ii.    *Nevada civil RICO and Nevada civil RICO conspiracy against Defendants Ahmad and Hasan*

Defendants argue "Plaintiff's Nevada RICO claims are . . . subject to dismissal on the same grounds set forth . . . above," because "Nevada courts have interpreted the state RICO statute consistently with the provisions of federal RICO."  ECF No. 88 at 12-13, *citing in part Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 71 (9th Cir. 1994) ("Nevada courts have interpreted the state RICO statute consistently with the provisions of federal RICO.") (internal citation omitted).  Because the Court finds Plaintiff has standing to bring its federal civil RICO and civil RICO conspiracy claims, it follows that Plaintiff has standing to also bring its Nevada civil RICO and civil RICO conspiracy claims.  Thus, Defendants' standing argument fails.

Defendants also argue that both of Plaintiff's Nevada RICO claims "fall outside the territorial scope of Nevada statutory authority."  *Id*. at 13.  Defendants state:

> [Plaintiff's] proposed First Amended Complaint is categorically devoid of any allegations that would place the alleged behavior within the scope of the Nevada RICO statutes. . . . [A]ll parties are located in Arizona.  All acts are presumed to have occurred in Arizona.  In fact, Plaintiff admits that Arizona law, no Nevada law, applies to its common law causes of action.

*Id.* In reply, Plaintiff responds that the "Nevada jurisdictional provision for . . . civil RICO claims . . . allows civil actions in [the district court of the State in the county in] which the prospective defendant resides or has committed any act which subjects him to criminal or civil liability." ECF No. 95 at 10, *citing* NRS 207.470(3) (Nevada's RICO statute).[4] However, as pleaded, Plaintiff's proposed FAC fails to sufficiently allege Nevada RICO claims against Ahmad or Hasan based on either Defendant's residency.

Specifically, Plaintiff alleges Defendant Ahmad is a "resident of Nevada and Arizona" (ECF No. 76-1 ¶ 9), and that Defendant Hasan is a "resident of Arizona" (*id.* ¶ 10). A "natural person . . . [is] deemed to reside in the [sole] judicial district in which that person is domiciled." 28 U.S.C. § 1391. Thus, Ahmad must reside in either Nevada or Arizona, and is not a resident of both states. Plaintiff's proposed FAC does not establish that Hasan or Ahmad resides in Nevada and, therefore Plaintiff's proposed FAC does not satisfy this element of NRS 207.470(3).

Plaintiff's proposed FAC also fails to allege that either Defendant Ahmad or Hasan committed an "act which subjects him to criminal or civil liability" in Nevada. NRS 207.470(3); *see also* ECF No. 76-1 ¶¶ 100-127. Plaintiff maintains it will "likely show that one of the defendants committed any act in the State [of Nevada and, therefore], the allegation of Nevada civil RICO violations is proper. ECF No. 95 at 10. However, NRS 207.470(3) requires something more, and directs a plaintiff to allege that a prospective defendant "committed an[] act *which subjects him to criminal or civil liability*" in Nevada. Such allegations are missing from Plaintiff's proposed FAC. Thus, Plaintiff's Nevada civil RICO and civil RICO conspiracy claims fail to be "pleaded with specificity" and, at this time, the actions alleged fall outside the scope of Nevada statutory authority. *Morris v. Green Tree Serv., LLC*, Case No. 2:14-cv-01998-GMN-CWH, 2015 WL 4113212, at *13 (D. Nev. July 8, 2015) (internal citation omitted).

Accordingly, the Court recommends denying Plaintiff's Motion for Leave to File its FAC with leave to amend its civil RICO and civil RICO conspiracy claims.

---

[4] Plaintiff mistakenly cites to NRS 207.479 rather than NRS 207.470.

###### iii.    *Conversion against all Defendants*[5]

Arizona law states "[c]onversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Miller v. Hehlen*, 104 P.3d 193, 203 (Ariz. Ct. App. 2005) (internal citation omitted). Defendants insist Plaintiff cannot allege a conversion claim under Arizona law because Plaintiff "alleges damages for the full amount of the termination fee while only alleging wrongful conduct in the timing of transfer of said fee." ECF No. 88 at 14. Again, this is a misinterpretation of Plaintiff's allegations.

Plaintiff not only takes issue with the timing of the termination payment, but also with Defendants' serious interference of those funds alleged to belong to Sage Memorial. ECF No. 76-1 ¶ 129 ("When Defendants RH, Razaghi and Hasan unilaterally withdrew . . . $10,855,134.15 from Plaintiff's bank account on August 27, 2018, they engaged in the tort of conversion. That is, the act of wrongful dominion and control over the personal property of Sage Memorial in denial of or inconsistent with the rights of Sage"). At this pleadings stage, Plaintiff's allegations in its FAC are sufficient to state a conversion claim against all Defendants.

###### iv.    *Civil conspiracy against all Defendants*

"Both civil conspiracy and aiding and abetting are derivative torts" under Arizona law. *Vicente v. City of Prescott, Ariz.*, Case No. CV11-8204-PCT-DGC, 2012 WL 1438695, at *6 (D.

---

[5]    "In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996). Both Nevada and Arizona use the "most significant relationship" test articulated in the Restatement (Second) of Conflict of Laws § 145 stating that the "rights and liabilities of the parties in tort actions are determined by the local law of the state that has the most significant relationship to the occurrence and the parties stated in [Restatement] § 6." *Gen. Motors Corp. v. Eighth Judicial Dist. Ct. of State of Nev. ex rel. Cnty. of Clark*, 134 P.3d 111, 115 (Nev. 2006) (Nevada); *Lange v. Penn Mut. Life Ins. Co.*, 843 F.2d 1175, 1179 (9th Cir. 1988) (Arizona).

As previously discussed, the Court will likely exercise federal subject matter jurisdiction over Plaintiff's federal civil RICO and RICO conspiracy claims based on the interstate nature of Defendants' email communications. In turn, the Court may, in its discretion, exercise "supplemental jurisdiction over [Plaintiff's remaining state law] claims that are so related to [the federal civil RICO] claims in this action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). If the Court chooses to exercise supplemental jurisdiction over Plaintiff's related state law claims, it will likely apply Arizona substantive law to Plaintiff's common law claims because Arizona has the most significant relationship to the occurrence and the parties. That is, Arizona is where the injuries and the conduct causing the injuries complained of are alleged to have occurred, Plaintiff is an "Arizona non-profit corporation," Defendant RH's principle place of business is in Arizona, and Defendant Hasan is a "resident of Arizona." Accordingly, the Court analyzes Plaintiff's conversion, civil conspiracy, tortious interference with contract, common law fraud, constructive fraud, and aiding and abetting state law claims under Arizona law.

Ariz. Apr, 26, 2012) (internal citations omitted).  Plaintiff alleges that the "conspiracy between RH, [Ahmad,] and Hasan was the agreement to commit the wrongful acts (i.e. torts) of fraud, conversion[,] and intentional interference with contract."  ECF No. 76-1 ¶ 134.  Because Plaintiff sufficiently alleges underlying torts upon which its civil conspiracy claim could rest, the Court finds Plaintiff's civil conspiracy claim is sufficiently pleaded.

Defendants further allege that Plaintiff's civil conspiracy claim fails because "agents and employees of a corporation cannot conspire with their corporate principal or employer when acting in their official capacities on behalf of the corporation and not as individuals for their individual advantage."  ECF No. 88 at 15, *citing Perry v. Apache Junction Elementary Sch. Dist. No. 43 Bd. of Trs.*, 20 Ariz. App. 561, 564 (Ariz. App. 1973) (internal quotation marks omitted).  However, Plaintiff's proposed FAC alleges that the "acts of [Ahmad], RH[,] and Hasan, *each acting out of self-interest*, were intentional and deliberate and did cause the direct loss of $10,855.134.15 by Sage Memorial."  ECF No. 76-1 ¶ 134.  At the pleading stage, these allegations sufficiently state a civil conspiracy claim against each Defendant.

> *v.    Tortious interference with contract against Defendant Ahmad*

Under Arizona law, the "elements of a cause of action for intentional interference with contract are a contract between the plaintiff and a third party; knowledge of the defendant that the contract exists; intentional interference by the defendant which causes the third party to breach the contract; a showing that the defendant acted improperly; and a showing that damage resulted to the plaintiff."  *Barrow*, 761 P.2d at 152 (internal citation omitted).

Defendants maintain Sage Memorial lacks standing to bring its tortious interference with contract claim because the allegations in Plaintiff's proposed FAC do not support an inference that a contract was interfered with or that Plaintiff has otherwise injured.  ECF No. 88 at 16-17.  The Court finds Defendants' standing argument will likely fail because Plaintiff sufficiently alleges it suffered concrete financial loss and injury to its business or property due to Ahmad's intentional interference with the contract between Sage Memorial and the United States.  ECF No. 76-1 ¶¶ 76-89, 140-41.

It is true that Judge Navarro previously denied Plaintiff's Motion for Preliminary Injunction. ECF No. 43 at 6.  However, it does not follow that Plaintiff fails to allege an injury-in-fact sufficient to bring its tortious interference with contract claim because Plaintiff failed to satisfy the element of irreparable harm necessary to support a preliminary injunction.  In other words, as Plaintiff correctly points out, Judge Navarro's Order was "limited only to analyzing whether Plaintiff had shown irreparable injury to support its request for a preliminary injunction."  ECF No. 65 at 7 (internal citation omitted).  Further, Plaintiff sufficiently pleads that Ahmad "knew about the settlement agreement (contract) between Sage Memorial and the United States (including his exclusion from receiving any monies), . . . intentionally interfered with that contract when he unilaterally withdrew more than $10.8 million from Sage's bank account on August 27, 2018 thereby causing a breach of that relationship . . . and his conduct in engaging in the foregoing was improper."  ECF No. 76-1 ¶ 141.  Thus, Plaintiff's tortious interference with contract claim is likely to proceed as pleaded against Ahmad.

> vi. *Common law fraud against all Defendants and constructive fraud against Defendants Ahmad and Hasan*

Under Arizona law, a common law fraud claim requires proof of nine elements: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in a manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the truth of the representation; (8) the right to rely on it; and (9) consequent and proximate injury." *McNamus v. Am. Exp. Tax and Bus. Servs., Inc.*, 67 F.Supp.2d 1083, 1089 (D. Ariz. 1999) (internal citation omitted).  Defendants argue Plaintiff fails to plead the existence of a material misrepresentation necessary to support its fraud claims because the transfer of the termination funds six days early did not cause a proximate injury upon which Plaintiff can establish standing for fraud.  ECF No. 88 at 17-18.  For reasons previously stated, the Court finds Defendants' argument on this basis is without merit.

> vii.    *Aiding and abetting against all Defendants and Does and Roes Defendants*

Defendants allege "[a]iding and abetting is a derivative tort which must be based on another underlying common law claim." ECF No. 88 at 18, *citing Vicente*, 2012 WL 1438695, at \*6. As the Court states above, Plaintiff sufficiently alleges underlying torts in its proposed FAC upon which a derivative tort, including its aiding and abetting claim, can rest.

In addition, although there is no provision in the federal rules permitting the use of fictitious "Doe" defendants (*Graziose v. Am. Home Prods. Corp.*, 202 F.R.D. 638, 643 (D. Nev. 2001)), this does not mean Plaintiff's aiding and abetting claim, which is otherwise sufficiently pleaded, must be dismissed in its entirety. Thus, the Court recommends granting Plaintiff leave to amend its FAC to remove references to Does and Roes Defendants in its aiding and abetting claim. ECF No. 76-1 ¶¶ 152-55. "This in no way precludes [Plaintiff's] right, upon learning of the participation of additional parties, to seek to amend the complaint . . . and have the amended relate back in time to the original filing if the circumstances justify it." *Graziose*, 202 F.R.D. at 643.

> 4.    <u>The Court recommends Plaintiff be denied leave to state a claim for declaratory relief, as the Declaratory Judgment Act does not create an independent claim.</u>

"Declaratory relief is not a separate cause of action or independent grounds for relief." *Ames v. Caesars Ent. Corp.*, Case No. 2:17-cv-02910-GMN-VCF, 2019 WL 1441613, at \*6 (D. Nev. Apr. 1, 2019); *see also 10E, LLC v. Travelers Indem. Co. of Connecticut*, Case No. 2:20-cv-04418-SVW-AS, 2020 WL 5359653, at \*2 (C.D. Cal. Sept. 2, 2020) ("Declaratory relief is not a standalone cause of action.") (internal citation omitted); *Veridian Credit Union v. Eddie Bauer, LLC*, 295 F.Supp.3d 1140, 1152 n.5 (W.D. Wash. 2017) (The Declaratory Judgment Act "creates only a remedy and not an independent claim."). Here, Plaintiff improperly pleads declaratory relief as a standalone claim against Defendants pursuant to the Declaratory Judgment Act. ECF No. 76-1 ¶¶ 156-160. Accordingly, it is recommended Plaintiff be denied leave to state a claim for declaratory relief.

**III.    ORDER**

Accordingly,

IT IS HEREBY ORDERED that Defendants' Motion to Stay Discovery and/or Reconsideration (ECF No. 56) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Defendants' Motion for Reconsideration is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion to Stay Discovery is GRANTED.

IT IS FURTHER ORDERED that Defendants' Motion for Protective Order to Limit Subpoenas Served by Plaintiff (ECF No. 72), Plaintiff's Motion to Compel Production of Documents (ECF No. 98), and Defendants' Motion for Protective Order (ECF No. 110) are DENIED without prejudice as moot.

**IV.    RECOMMENDATION**

IT IS HEREBY RECOMMENDED that Plaintiff's Motion for Leave to File First Amended Complaint (ECF No. 76) be DENIED without prejudice and with leave to amend to correct the deficiencies stated above.

DATED THIS 15th day of January, 2021.

ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).