# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

NAVAJO HEALTH FOUNDATION – SAGE )
MEMORIAL HOSPITAL, INC., )
)                    Case No.: 2:19-cv-00329-GMN-EJY
          Plaintiff, )
)                    **ORDER**
    vs. )
)
RAZAGHI DEVELOPMENT COMPANY, )
LLC; AHMAD R. RAZAGHI; TAUSIF )
HASAN, )
)
         Defendants. )
_____)

Pending before the Court is the Motion to Dismiss Plaintiff's Second Amended Complaint, (ECF No. 147), filed by Defendants Tausif Hasan ("Hasan"), Ahmad R. Razaghi ("Razaghi"), and Razaghi Development Company, LLC ("RDC") (collectively, "Defendants"). Plaintiff Navajo Health Foundation – Sage Memorial Hospital ("Sage") filed a Response, (ECF No. 164), and Defendants filed a Reply, (ECF No. 169).

For the reasons discussed below, the Court **GRANTS in part and DENIES in part** the Motion to Dismiss.

## I.  **BACKGROUND**

This case arises from Defendants' alleged scheme to defraud Sage of over $10.8 million through Defendants' deceptive acquisition and invocation of a lucrative termination payment provision in the hospital management agreement between RDC and Sage (the "Management Services Contract"), followed by Defendants' billing for services not rendered. (*See generally* Compl., ECF No. 1). Sage is a federally funded non-profit hospital serving an indigent Navajo Nation community in rural Ganado, Arizona. (*Id.* ¶ 23). The majority of Sage's operation budget comes from the Indian Health Service ("IHS"), an agency within the U.S. Department

of Health and Human Services. (*Id.* ¶ 24).  Principally, Sage alleges that Defendants fraudulently induced Sage's Board of Directors ("BOD") to unwittingly authorize a contractual amendment to the parties' Management Services Contract containing an extremely generous termination payment, which Defendants invoked to siphon $10.8 million from Sage's operating budget. (*See id.* ¶¶ 39–57).  The Court's below discussion provides background on the relationship between Sage and Defendants, up to and including the scheme described in the Complaint.

### A.   SAGE ENGAGES RAZAGHI TO MANAGE HOSPITAL OPERATIONS

Pursuant to Sage's bylaws, every member of its BOD must be a member of the Navajo Nation and reside in the community in or around Ganado, Arizona. (*Id.* ¶ 21).  Sometime in 2007, "Razaghi and his brother partnered with a friend, Manuel Morgan ('Morgan'), a member of the Navajo Tribe and former Navajo Nation County Commissioner, to form Morgan & Associates, LLC, a company in which Morgan [held] majority ownership so that the entity could qualify as a Navajo business." (*Id.* ¶ 26).  Sage alleges that Razaghi, leveraging Morgan's status as a member of the Navajo Nation, persuaded Sage to award Morgan & Associates a management services contract. (*Id.* ¶ 27).  Under the terms of this contract, Razaghi would serve as Sage's "Contract CEO." (*Id.*).  Sage claims Razaghi subsequently created business entities, including RDC, to supply Sage with medical personnel at a profit. (*Id.* ¶ 28).

On March 18, 2011, RDC[1] entered into the Management Services Contract with Sage's BOD. (*Id.* ¶ 29).  This contract replaced Morgan & Associates' contract with the hospital and placed management of Sage under Razaghi and RDC's control. (*Id.*).  Sage alleges that this was when the "multiple different schemes to defraud Sage Memorial began through the use of the mail and interstate wires." (*Id.*).

---

[1] The Court's use of "RDC" is inclusive of allegations concerning predecessor entities such as "Razaghi Healthcare," which the Complaint abbreviates as "RH". (*See* Compl. ¶¶ 28–29).

**B.     THE FIRST AMENDMENT TO THE MANAGEMENT SERVICES CONTRACT**

On or about May 17, 2013, Sage's BOD approved a "First Amendment" of the March 18, 2011 Management Services Contract. (*Id.* ¶ 30). "Notably, . . . the [First Amendment to the] contract provided that [RDC] could hire, at Sage Memorial's expense, special counsel to represent . . . Sage Memorial . . . with respect to specific legal matters." (*Id.*) (internal alterations and quotation marks omitted). Razaghi selected Stephen Hoffman ("Hoffman") to serve as RDC's special counsel. (*Id.* ¶ 17). Around this time, non-party Stenson Wauneka ("Wauneka") served as Chairman of the BOD. (*Id.* ¶ 30). Sage alleges Razaghi "developed a close and friendly relationship with Wauneka, meeting with him privately on numerous occasions . . . for which Wauneka would receive a financial benefit following each meeting in the form of an 'honorarium payment.'" (*Id.*).

**C.     LEGAL TROUBLES ARISE FROM DEFENDANTS' MANAGEMENT**

During RDC's management of Sage, Razaghi and others allegedly lined their pockets at Sage's expense. On October 16, 2014, a group of whistleblowers filed a complaint in the United States District Court for the District of Arizona, alleging Razaghi and others violated the False Claims Act ("FCA"), 31 U.S.C. § 3729. *See* Case No. 3:14-cv-8916-PCT-SRB. These whistleblowers alleged Razaghi "devised a massive scheme through which he abused his relationship with [Sage] to divert millions of dollars of federal funds provided by federal programs and contracts from Sage to himself" and others. (*Id.* ¶ 32). In January 2017, after the United States declined to intervene, the whistleblowers voluntarily dismissed the action. (*Id.* ¶ 33).

Around the same time the whistleblower complaint was filed, IHS advised Sage that the federal government would not be renewing its contracts with the hospital. (*Id.* ¶ 34). On October 23, 2014, Sage sued the Secretary of the U.S. Department of Health and Human

Services in the United States District Court for the District of New Mexico, challenging the IHS action and alleging the federal government breached a number of prior contracts from 2009 through 2013. (*Id.*); (*See also Navajo Health Foundation – Sage Memorial Hospital, Inc. v. Burwell et al.*, 263 F. Supp. 3d 1083 (D.N.M. 2016)). On December 16, 2016, the United States agreed to pay $122,500,000.00 to settle the litigation with Sage. Sage represents that the:

> settlement document memorializing the parties' agreement provided that payment must be used to fund Indian healthcare services, including ancillary services to the hospital or for any other legitimate healthcare purpose. However, the settlement agreement also expressly prohibited the hospital from providing payment to any management company or affiliated entity. Notably, the agreement also singled out Razaghi by name by further providing that "[i]f Ahmad R. Razaghi or any current officer or officer-level employee of a Razaghi-level entity is convicted of a felony crime of fraud related to the management of [the] [h]ospital or any federal health care program operated by [the Hospital] within 5 years of the effective date of this Settlement Agreement, IHS may conduct additional monitoring on the expenditure of the Settlement sum . . . ." (*Id.* ¶ 36).

### D.    THE SECOND AMENDMENT TO THE MANAGEMENT SERVICES CONTRACT

On June 16, 2017, Razaghi allegedly called a BOD meeting at which time Hoffman urged the BOD to approve a "Second Amendment" to RDC's Management Services Contract. (*Id.* ¶ 39). Sage claims none of the BOD members, with the possible exception of Wauneka, were provided with a copy of the proposed Second Amendment prior to this meeting. (*Id.*). Sage further claims this omission was in contravention of BOD rules and policies that require members be provided with important documents at least twenty-four hours in advance of a meeting so they can conduct meaningful review prior to voting. (*Id.*). Sage maintains none of the BOD members have any formal legal training or knowledge about contract interpretation and that many BOD members do not speak English as a first or native language. (*Id.*). Among other things, Section 5.D (the "Termination Payment Provision") of the proposed Second

Amendment "bestowed an extremely lucrative 'termination payment' upon Razaghi in the event he terminated the contract or the BOD terminated it for any reason (including for cause). These facts were inexplicably omitted from the BOD." (*Id.* ¶ 40).  In relevant part, Section 5.D(2) of the Termination Payment Provision provides that:

> In the event that this Contract expires, or [RDC] terminates this Contract for cause, or the Corporation elects to terminate this Contract at any time prior to expiration of this Contract for any Reason other than those listed as "cause" in Section 4.A, the Corporation shall, in addition to any other amounts due under this Contract, pay [RDC] a Termination Payment in an amount equal to the average of the amount paid to [RDC] by the Corporation each year during the most recent four years of service, including the year of expiration or termination, which shall be prorated through the actual date of such expiration or termination.

(*Id.* ¶ 41) (internal alterations omitted).  In addition to the Termination Payment Provision, the Second Amendment proposed an increase of Razaghi's base hourly compensation from $175 per hour to $495 per hour and stated that the contract would retroactively become effective from July 6, 2016. (*Id.* ¶ 42).  Sage claims Hoffman recommended the BOD approve the Second Amendment without discussing the Termination Payment Provision or the increase in Razaghi's base hourly rate. (*Id.* ¶ 41).  The BOD approved the Second Amendment. (*Id.* ¶ 42). Razaghi, and Wauneka in his capacity as BOD Chairman, then signed the contract. (*Id.*).

### E.    THE ALLEGED TERMINATION PAYMENT SCHEME

About a year later, Razaghi allegedly began taking steps in furtherance of terminating the Management Services Contract.  On July 11, 2018, Nicole Hardy ("Hardy"), a non-party to this action and an accounts specialist in Sage's finance department, allegedly received an email request from Razaghi conveyed through Tom Matenaer ("Matenaer"), Sage's Controller, to produce a "cost report" for the period from 2014 through 2017. (*Id.* ¶ 45).  Two days later, Hardy emailed the cost report to Matenaer and Sage's staff accountant, Mary Arave ("Arave"). (*Id.* ¶ 46).  On July 18, 2018, Razaghi contacted contract CEO Christi El-Meligi ("CEM") and Chief Operating Officer Netrisha Dalgai ("Dalgai") to tell them they were "doing a great job."

(*Id.* ¶ 47).  On July 19, 2018, CEM held a meeting with Matenaer and Sage's human resources director to discuss the hospital's obligations to comply with Navajo Nation preferences in employment laws and audit issues related to the finance department. (*Id.* ¶ 48).  On July 20, 2018, Razaghi circulated an email advising Sage's staff that CEM would be "re-assigned and . . . removed" from her position. (*Id.* ¶ 49) (internal quotation marks omitted).  That same day, BOD member Ray Ann Terry emailed her fellow board members to request a special meeting to discuss her concerns with the RDC's Management Services Contract and CEM's reassignment/removal. (*Id.*).

On July 23, 2018, the BOD convened a special meeting to discuss retaining independent counsel to review RDC's twice-amended Management Services Contract. (*Id.* ¶ 50).  The BOD decided that this independent counsel should not be someone appointed by Razaghi. (*Id.*).  Razaghi strongly objected to this decision and requested a copy of the current Sage bylaws and conflict of interest policies over email. (*Id.*).  Notwithstanding Razaghi's protests, the BOD engaged Jeff Davis ("Davis"), of Barnes & Thornburg, LLP, to review the amended Management Services Contract and Razaghi's relationship with Sage. (*Id.*).  Sometime thereafter, Razaghi held an emergency meeting with RDC management staff. (*Id.* ¶ 51).  Razaghi allegedly invited Wauneka to attend this meeting but declined to invite the majority of the other BOD members. (*Id.*).

On August 2, 2018, RDC and Razaghi's counsel mailed and emailed a letter to Wauneka advising him of the BOD's alleged "prospective breaches and/or interference" regarding the Management Services Contract. (*Id.* ¶ 52).  In support of their assertions, Defendants' letter explains "unauthorized communications and actions between certain Board members and [CEM] and [Dalgai] . . . amounted to contract interference and a material breach of the [management] contract." (*Id.*) (internal quotation marks omitted).  The letter also states that "any attempt by the Board to cause the Contract to expire or terminate early will result in

[Sage's] immediate obligation to pay the Termination Payment to [RDC] in accordance with the Contract, which will be several million dollars." (*Id.*) (internal quotation marks omitted). Sage notes that RDC's Management Services Contract provides Sage with a thirty-day cure period in the event of a breach, a fact which allegedly went unmentioned in this letter. (*Id.*) Accordingly, Sage asserts that to the extent this August 2, 2018 letter served as notification of the BOD's prospective breach, the BOD would have had until September 2, 2018 to cure that breach under the terms of the Management Services Contract. (*Id.*).

On August 13, 2018, Wauneka emailed Davis and two other BOD members, copying Razaghi on the message, stating: "I believe we are at a point in time where the question is whether the Board wants to continue its relation with Razaghi Development Company, LLC." (*Id.* ¶ 53). Davis responded to this email by writing, in part:

> I would respectfully disagree with your statement that the Board is [at] a point where the question is whether the Board wants to continue its relationship with Razaghi Development Company. Quite the contrary, I have had the pleasure of talking with other Board members and they are ready and willing to work with all and invigorate the Board so that it is an equal partner in insuring [sic] that members of the Navajo Nation are provided services by Sage Memorial Hospital received the best possible medical treatment and programs at a cost-efficient medical facility.

On August 20, 2018, the BOD held an executive session meeting with Davis and Sage Memorial's independent financial auditor Heather Gretch ("Gretch"). (*Id.* ¶ 54). The BOD, Davis, and Gretch allegedly discussed the Management Services Contract, payments made to RDC, and the decision to not approve an incentive bonus for Razaghi that year. (*Id.*).

On August 27, 2018, Hardy received a telephone call from Defendant Hasan, Sage's contract Chief Financial Officer and an employee of RDC, requesting status and payment of three invoices sent earlier that morning. (*Id.* ¶¶ 10, 55(b)). Hardy reviewed the three invoices, which totaled $11,048,517.71. (*Id.* ¶ 55(b)). One of the invoices, Invoice #1369, referenced a

"Contract Termination Fee, Section 5.D" of $10,855,134.15 (the "$10.8 million"). (*Id.*) (*See also* Invoices, Ex. B to Compl., ECF No. 1-2 at 2).  The only supporting document allegedly attached to this Invoice was Hardy's July 16, 2018 cost report that Razaghi had requested. (*Id.*). Apprehensive about inputting an invoice for such a large amount, Hardy discussed appropriate next steps with her supervisor, Arave, and Arave's supervisor, Matenaer. (*Id.*).  Matenaer said he would speak to Hasan about the matter. (*Id.*).  When Hardy returned to her desk after taking a break, she noticed that Matenaer had emailed Hasan about Invoice #1369. (*Id.* ¶ 55(c)). Hardy also saw that Hasan had left her a voice message instructing her to call him back immediately. (*Id.*).  "Upon returning his call, Hardy was ordered by Hasan to immediately input the invoices into the system for payment and to code the payment for [I]nvoice #1369 as 'Management Services Fees.'" (*Id.*).  Hardy complied and uploaded the Invoice into Sage's payment system. (*Id.* ¶ 55(d)).  Thereafter, Hasan purportedly accessed Sage's system to transfer $500,000.00 from Sage's IHS Funding Account and $10,855,000.00 from the hospital's Third-Party Revenue Account to Sage's General Operating Account to cover the $10.8 million invoice. (*Id.* ¶ 55(f)).  Hasan then approved the $10.8 million payment to RDC. (*Id.* ¶ 55(g)).

On August 29, 2018, Razaghi sent a physical letter addressed to the BOD expressing his "concerns over the state of the Board of Directors," and notified the BOD that attorney Davis has "no authority [to] represent Navajo Sage under governing Navajo law and will not be paid." (*Id.* ¶ 56); (*see also* Memorandum Re: Recent Activities of Board of Directors or Individual Members Thereof, Ex. C to Compl., ECF No. 1-3 at 2).  Razaghi also stated that Sage's management would communicate with the BOD "only through the Chairperson[, Wauneka,] or the Board's authorized legal counsel," Hoffman. (*Id.*).  This letter did not disclose that Razaghi had withdrawn more than $10 million from Sage's Operating Account two days prior or that he had purportedly terminated the agreement to manage Sage. (*Id.*).

## F.    ALLEGED SUBSEQUENT "INVOICE FRAUD"

Razaghi and RDC continued to send Invoices to Sage for services allegedly never

rendered including, but not limited to:

> a. September 11, 2018 (invoice #1370) in the amount of $31,678.32 for credit card, legal and executive leadership services;
> b. September 6, 2018 (invoice #1371) in the amount of $74,448.08 for management incentive services fee;
> c. September 6, 2018 (invoice #1372) in the amount of $129,986.76 for management consulting services;
> d. September 6, 2018 (invoice #1373) in the amount of $106,120.38 for executive leadership, legal and professional services;
> e. October 4, 2018 (invoice #1374) in the amount of $156,694.93 for management consulting services (with interest charges);
> f. November 1, 2018 (invoice #1382) in the amount of $129,331.55 for management consulting services (with interest charges);
> g. November 27, 2018 (invoice #1383) in the amount of $511.395.11 for management consulting services for "transition period" (with interest charges);
> h. December 1, 2018 (invoice #1384) in the amount of $443,996.71 (with interest charges) for "legal and professional expenses[]"[; and,]
> i. January 2, 2019 (invoice #1385) in the amount of $235,873.85 (with interest charge[s] for "management consulting services" and "incentive fees[.]"
> (Compl. ¶ 57).

Sage's Complaint seeks compensatory and treble damages for injuries to its business and

property allegedly caused by Defendants' racketeering activity in violation of the federal

Racketeer Influenced and Corrupt Organizations Act ("RICO"), companion Nevada

racketeering statutes, and various state common law claims. (*Id.* ¶¶ 58–143).  Sage also seeks

declaratory and injunctive relief. (*Id.* ¶ 145).

## G.    PROCEDURAL HISTORY

On June 5, 2020, Defendants filed its First Motion to Dismiss Plaintiff's Complaint,

(ECF No. 46), which the Court ultimately granted with leave to amend. (*See* Order Granting

MTD, ECF No. 128).  Plaintiff thereafter filed an Amended Complaint, (ECF No. 144).  On

August 23, 2021, Defendants filed the instant Second Motion to Dismiss the Amended Complaint. (*See* Second MTD, ECF No. 147).

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action that fails to state a claim upon which relief can be granted. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim, the Court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

The Court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts showing that a violation is *plausible*, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

A court may also dismiss a complaint pursuant to Federal Rule of Civil Procedure 41(b) for failure to comply with Federal Rule of Civil Procedure 8(a). *Hearns v. San Bernardino Police Dept.*, 530 F.3d 1124, 1129 (9th Cir. 2008). Rule 8(a)(2) requires that a plaintiff's complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Furthermore, the Supreme Court has rejected any sort of "heightened" pleading requirement for § 1983 municipal liability claims because such a heightened pleading standard cannot be "square[d] . . . with the liberal system of 'notice

pleading' set up by the Federal Rules." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion . . . . However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citations omitted).  Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  Under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986).  Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss becomes a motion for summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

Additionally, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The rule requires that claims of fraud be accompanied by the "who, what, when, where, and how" of the conduct charged, *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)), so that the complaint may not simply "lump multiple defendants together." *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011).  In other words, the complaint "must include 'an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (quoting *Swartz v. KPMG, LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam)) (internal quotations omitted).  Rule 9(b)'s particularity requirement ensures that the defendants are on "notice of the particular

misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Vess*, 317 F.3d at 1106 (internal quotations omitted).

If the court grants a motion to dismiss, it must then decide whether to grant leave to amend. The court should "freely give" leave to amend when there is no "undue delay, bad faith[,] dilatory motive on the part of the movant . . . undue prejudice to the opposing party by virtue of . . . the amendment, [or] futility of the amendment . . . ." Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962). Generally, leave to amend is only denied when it is clear that the deficiencies of the complaint cannot be cured by amendment. *See DeSoto v. Yellow Freight Sys., Inc*., 957 F.2d 655, 658 (9th Cir. 1992).

## III.   **DISCUSSION**

Sage's Amended Complaint both amends and adds new causes of action: (1) Federal RICO violations under 18 U.S.C. § 1962(c) against Razaghi and Hasan; (2) Federal RICO Conspiracy in violation of 18 U.S.C. § 1962(d) against Razaghi and Hasan; (3) Fraud against all Defendants; (4) Civil Conspiracy and Aiding and Abetting against all Defendants; (5) Breach of Fiduciary Duty against Razaghi Healthcare; (6) Breach of Fiduciary Duty against Razaghi; (7) Breach of Fiduciary Duty against Hasan; (8) Rescission of the Second Amendment to the CEO Services Contract against Razaghi Healthcare; (9) Rescission of the First Amendment to the CEO Services Contract against Razaghi Healthcare; (10) Breach of Contract relating to the Termination Payment against Razaghi Healthcare; (11) Breach of Contract relating to the Base Pay Rate against Razaghi Healthcare; (12) Breach of the Covenant of Good Faith and Fair Dealing against Razaghi Healthcare; (13) Conversion against Razaghi Healthcare, Razaghi, and Hasan; (14) Constructive Fraud against all Defendants; (15) Unjust Enrichment against all Defendants; and (16) Constructive Trust against all Defendants. (*See* Am. Compl. ¶¶ 145–304). The Court addresses the sufficiency of the allegations in support of each cause of action below.

### A.    CLAIM 1: FEDERAL RICO – 18 U.S.C. 1962(c)

"To state a civil RICO claim, plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiffs' 'business or property.'" *Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001) (citing 18 U.S.C. § 1964(c)).  The Ninth Circuit has recognized that the heightened pleading standards applicable to fraud claims under Rule 9(b) apply to a RICO action alleging predicate acts of fraud. *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991).

Defendants seek dismissal of Sage's RICO claim, arguing: (1) Sage has not adequately alleged predicate acts; and (2) Sage has failed to allege a pattern of racketeering activity. (MTD 11:9–11).

#### 1.    Predicate Acts

Plaintiff alleges three separate schemes to defraud in support of its mail and wire fraud allegations:

1. Systemic Overbilling And Billing For Services Not Provided To Plaintiff From June 1, 2017 Through The Termination Of Defendants In August 2018;

2. Mailings and Wirings Related and in Furtherance of the Scheme to Defraud Plaintiff of the Illegally Imposed Termination Fee; and

3. The Attempt to Defraud Plaintiff After August 2018 Through E-mails For Fictitious Services

(Am. Compl ¶¶ 165–177).  Defendants challenge each alleged scheme, arguing that Plaintiff fails to sufficiently plead predicate acts. (MTD 11:20–17:7).

Predicate "racketeering activity" is prescribed by statute and includes both "mail fraud" and "wire fraud." *See* 18 U.S.C. § 1961(1) (citing 18 U.S.C. §§ 1341, 1343).  "The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails

1    or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Elec. Props.*

2    *East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).  Further, because

3    RICO claims involve underlying fraudulent acts, Federal Rule of Civil Procedure 9(b)'s

4    heightened pleading standard applies to the allegations. *Edwards v. Marin Park, Inc.*, 356 F.3d

5    1058, 1065–66 (9th Cir. 2004); Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must

6    state with particularity the circumstances constituting fraud or mistake.").  Thus, to sufficiently

7    plead its RICO claim, a plaintiff must specify the time, place, and content of the alleged

8    underlying fraudulent acts and statements, as well as the parties involved and their individual

9    participation. *Edwards*, 356 F.3d at 1066.

### a.   *First and Third Schemes relating to fraudulent invoices*

11           Plaintiff alleges that Razaghi and Hasan improperly and illegally obtained money from

12   Sage Memorial by submitting invoices asking Sage to pay for expenses or services that were

13   not for the benefit of, Sage, but were instead incurred solely for the purpose of advancing

14   Razaghi's and Hasan's independent business or personal interests. (Am. Compl. ¶¶ 165–174).

15   Plaintiff further claims that Defendants continued to email invoices to Sage demanding

16   payment for over $1.8 million for fictitious services. (*Id.* ¶ 177).  Defendants move to dismiss

17   Plaintiff's first and third alleged scheme concerning invoice fraud on two grounds: (1) Plaintiff

18   fails to plausibly allege invoice fraud via wire and mail; and (2) Plaintiff fails to allege invoice

19   fraud with particularity. (MTD 12:20–15:4, 17:8–21:5).

20           Here, Plaintiff plausibly alleges mail and wire fraud relating to false invoices. *See Elec.*

21   *Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (outlining that

22   the elements of wire or mail fraud are: ((1) the defendants formed a scheme or artifice to

23   defraud; (2) the defendants used the mails or wires in furtherance of the scheme; and (3) the

24   defendants acted with the specific intent to deceive or defraud)  Plaintiff alleges that

25   Defendants improperly and illegal obtained money from Sage Memorial through a series of

"Fraudulent Expenses." (Am. Compl. ¶ 165).  Plaintiff defines "Fraudulent Expenses" as "expenses or services that were not rendered or provided to, or for the benefit of, Sage Memorial, but were instead incurred solely for the purpose of advancing Razaghi's and Hasan's independent business or personal interests." (*Id*.).  As Defendants point out, Razaghi disclosed to Sage the nature of his and Hasan's efforts in aiding other Navajo Nation communities. (*Id*. ¶ 98).  Plaintiff, however, further alleges that "Razaghi did not inform the Sage Board that he would cause Sage Memorial to reimburse Razaghi Healthcare, NV for lawyers' fees, consultants' fees and lobbyists fee's that were being used exclusively to develop the Razaghi 638 Entities and for which Sage Memorial would never be reimbursed." (Resp to MTD 20:20–26).  Even though Razaghi informed the board of his intentions to help the Navajo Nations, he did not disclose to the board his intention to use Sage's funds to carry out such intentions.  As alleged by Plaintiff, Sage did not have notice that their funds would be used for an alternative purpose.[2]

Plaintiff also alleges predicate acts of wire and mail fraud with sufficient specificity. *Cf. Edwards*, 356 F.3d at 1066 (finding that the complaint fails to "make[. . .] out the time and place . . . [the] purportedly fraudulent "7 Day Legal Notices" were delivered and names the parties involved").  Here, Plaintiff identifies the specific date that Razaghi and Hasan allegedly sent in invoices requesting Fraudulent Expenses.[3] (Am. Compl. ¶¶ 167, 174(a)(i), 174(b)(i),

---

[2] Defendants also argue that the invoice fraud scheme is implausible because various board members, with independent fiduciary duties owed to Sage, did not find any fraudulent billings. (MTD 13:21–14:13). Defendants do not provide any supporting caselaw to support this assertion.  Furthermore, it is plausible that these independent financial audits were orchestrated by the alleged perpetrators of the fraud, Razaghi and Hasan, as Defendants themselves assert that "Razaghi and Hasan also ensured that independent financial audits occurred each year." (*Id*. 14:14–15).  As the Court construes Plaintiff's allegations liberally, the Court finds, at this stage, Defendants' arguments without merit.

[3] Defendants argue that Plaintiff fails to plausibly alleged invoice fraud because Plaintiff cites inconsistent dates for when the scheme began.  Specifically, Plaintiff raises allegations beginning in May 2015 whereas the title of the first scheme states that the invoice scheme occurred between "June 1, 2017 through the termination of Defendants in August 2018." (MTD 12:23–13:7).  The Court finds this discrepancy immaterial as courts, at the motion to dismiss stage, take all material allegations as true and construe them in the light most favorable to the

174(c)(i), 174(d)(i), 174(e)(i), 174(f)(i), 174(g)(i), 174(h)(i), 174(i)(i), 174(j)(i), 174(k)(i), 174(l)(i), 174(m)(i), 174(n)(i), 174(o)(i), 174(p)(i), 174(q)(i), 174(r)(i), 174(s)(i), 174(t)(i), 174(u)(i)).  Plaintiff further explains the items of compensation and expenses for each invoice. (*See e.g.,* Am. Compl. ¶ 174(a)(iv) (noting that "[a]mong other Fraudulent Expenses included on Monthly Invoice 1261 were items relating to Razaghi's personal travel from August 26, 2016 through May 11, 2017 in the amount of $8,586.85; a lobbyist in Washington, DC to advance Razahi's [sic] and Hasan's separate business interests in the amount of $10,491.27 . . .").  Given that Plaintiff alleges the time and content of each alleged invoice fraud, the Court finds that Plaintiff alleges a plausible predicate act as to the First and Third Schemes.

### b.   *Second Scheme relating to the termination fee fraud*

Plaintiff also alleges that Defendants further defrauded Plaintiff by submitting an invoice for the Termination Payment. (Am. Compl. ¶¶ 175–176).  Defendants argue that Plaintiff fails to allege a plausible scheme to fraud relating to the termination fee because the 2013 Amendment and Extension to the CEO Services Contract included a "severance payment," such that Defendants legally obtained the $10.8 million. (MTD 15:5–17:7).

Here, Plaintiff plausibly alleges a fraudulent scheme relating to the termination fee. *Elec. Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (outlining that the elements of wire or mail fraud are: ((1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the mails or wires in furtherance of the scheme; and (3) the defendants acted with the specific intent to deceive or defraud).  First, Plaintiff alleges that Defendants formed a scheme to defraud by electronically submitting a written invoice on August 27, 2018, for $10,855.134.15. (Am. Compl. ¶ 175(g)).  Plaintiff further claims that "both Razaghi and Hasan knew this statement was not true because the very contract they were

---

plaintiff. *See NL Indus., Inc.*, 792 F.2d at 898.  Given that Plaintiff includes allegations that the scheme occurred in 2015, the Court finds the seemingly clerical error in Plaintiff's title of the First Scheme immaterial.

relying upon[,] (the second amended contract) and cited in the invoice[,] permitted Sage a 30-day curative period." (*Id.*).  Though Defendants were legally entitled to severance payment under the CEO Services Contract, Plaintiff alleges Defendants obtained the $10.8 million under the guise of collecting the termination fee. (Am. Compl. ¶ 175).  The fact that Defendants were contractually entitled to severance payment, therefore, does not discount the fraudulent nature in which Defendants obtained the payment.  For the foregoing reasons, the Court finds that Plaintiff alleges a sufficient predicate act based on the second alleged scheme.  The Court now analyzes whether Plaintiff alleges a plausible pattern of predicate acts.

### 2.    Pattern of Racketeering Activity

Defendants argue that Plaintiff fails to allege a pattern of racketeering activity because the above schemes do not involve the same participants, same activities, or the manner of commission, and thus, are unrelated. (MTD 21:6–22:21).  Because Plaintiff cannot demonstrate relatedness, Defendants additionally assert that Plaintiff cannot sufficiently demonstrate continuity of the predicate acts. (*Id.* 22:18–21).

A "pattern of racketeering activity" requires "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).  While two predicate racketeering acts, as described in § 1961(1), "are necessary" to plead a civil RICO claim, "they may not be sufficient." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237–38 (1989) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n.14 (1985)).  There is more to showing a "pattern" of racketeering activity than "simply [pointing to] the number of predicate acts involved." *Id.* at 238.  A pattern requires that the acts have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics. . . ." *Sun Sav. and Loan Ass'n v. Dierdorff*,

825 F.3d 187, 192 (9th Cir. 1987) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 n.14 (1985)).

### a.   Relatedness

Here, Plaintiff alleges a plausible pattern of racketeering activity. *See Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366 (9th Cir. 1992) (finding that the predicate offenses are related if they have "the same or similar purposes, results, participants, victims or methods of commission"). The predicate acts relate to the same purpose, namely Defendants' acts in defrauding Sage for the personal enrichment of Razaghi and Hasan. (Am. Compl. ¶ 178). Defendants defrauded the same victim, Sage Memorial. (*Id.*). Additionally, the acts involved the same participants, Razaghi and Hasan.[4]

Defendants argue that the activities and manner of commission of the scheme are substantially different and thus, Plaintiff is unable to demonstrate a pattern of racketeering activity. In *Sairam v. Mercy Ret. & Care Ctr.*, the Northern District of California held that the plaintiff established a pattern of racketeering activity "even if [the] acts were made through different channels and made to different audiences (comments to Congress, regulators, the news media, or the public)." *Sairam v. Mercy Ret. & Care Ctr.*, No. 21-cv-04335-EMC, 2021 U.S. Dist. LEXIS 174677, at *15 (N.D. Cal. Sep. 14, 2021). The Northern District of California ultimately held that "the goal of the scheme to defraud . . . remains plausibly the same: to lull the public and government into false beliefs about the JUUL product and defendants' intent while defendants worked." *Id.*

The Court finds *Sairam* instructive. Like the defendants in *Sairam*, Defendants fraudulently obtained money from Sage through different channels, specifically fraudulent

---

[4] Defendants argue that Hasan was not involved in the entire scheme from May 2015 through January 2019 because "Sage admits Hasan was only involved [. . .] from September 2015 until September 2017 and again from December 2017 through August 2018." (MTD 22:5–6). However, even without Hasan, Plaintiff alleges that Razaghi was a constant participant in the scheme.

invoices concerning payment upon termination and payment for services alleged rendered for Razaghi's and Hasan's personal interest. (Am. Compl. ¶¶ 165–177).  The main goal to defraud Sage for Defendants' personal interest, however, remains plausibly the same.  As Plaintiff alleges, "[a]ll predicate acts had the same purpose of defrauding Sage Memorial of millions of dollars, all for the personal enrichment of the Razaghi and Hasan and their associates." (*Id*. ¶ 178).  Therefore, the minor difference between the acts—the method of commission—is immaterial.  The Court accordingly finds that Plaintiff plausibly alleges a RICO claim under 18 U.S.C. 1962(c).[5]

### B.  CLAIM 2: FEDERAL RICO – 18 U.S.C. 1962(d)

Defendants argue that the Court should dismiss the RICO conspiracy claim because the underlying RICO claim is insufficiently pleaded. (MTD 22:22–23:1).  As discussed above, the Court finds that Plaintiff plausibly alleges an underlying RICO claim.  Given that Defendants do not otherwise dispute Plaintiff's federal RICO conspiracy claim, the Court denies Defendants' Motion to Dismiss as to Plaintiff's second claim.

### C.  CLAIMS 3 AND 14: FRAUD AND CONSTRUCTIVE FRAUD

Defendants move to dismiss Plaintiff's claim and constructive fraud claim on three grounds: (1) Plaintiff's fraud claims are time-barred; (2) the economic loss doctrine precludes the fraud claims; and (3) Plaintiff otherwise fails to plead sufficient facts for fraud under FRCP 9. (MTD 23:2–24:23).

"A fraud claim, under Arizona law, requires proof of nine elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in a manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's

---

[5] The Court does not further discuss continuity as Defendants do not dispute continuity in either their Motion to Dismiss or Reply to the Motion to Dismiss. (*See* MTD 22:18–21).

reliance on the truth of the representation; (8) the right to rely on it; and (9) consequent and proximate injury." *McManus v. Am. Express Tax & Bus. Servs.*, 67 F. Supp. 2d 1083, 1089 (D. Ariz. 1999).

Here, Plaintiff fails to properly plead common law fraud and constructive fraud. In the Amended Complaint, Plaintiff broadly alleges that Defendants made false statements and material omissions "in matters comprising the Pattern of Racketeering Activity, the Predicate Acts, the 2013 Razaghi Compensation Fraud, the June 2017 Razaghi Compensation Fraud, the December 2017 Razaghi Compensation Fraud, and the Termination Payment Fraud." (Am. Compl. ¶ 189). Plaintiff, however, does not provide specific allegations as to how the statements were false or materially omitted. Plaintiff's allegations further fail to demonstrate the speaker's intent in making the fraudulent statements, knowledge of the false statements, or reliance on the false statements. Indeed, Plaintiff alleges new claims of fraud in its Amended Complaint that are less specific than those initially alleged in its Complaint, which, contrary to Plaintiff's representation, this Court dismissed with leave to amend in its prior Order. (Compl. ¶¶ 131–134); (Am. Compl. ¶¶ 188–197); (*see* Order Granting Mot. Dismiss 27:24–28:9, ECF No. 128). Because Plaintiff fails to plead a plausible claim of fraud and constructive fraud, the Court accordingly dismisses Plaintiff's third claim and fourteenth claim with leave to amend.

### D.   CLAIM 4: CIVIL CONSPIRACY AND AIDING AND ABETTING

Defendants move to dismiss Plaintiff's fourth claim—civil conspiracy and aiding and abetting—because the underlying theories derive from Plaintiff's fraud claims. (MTD 25:1–10). Because the Court dismissed Defendants' fraud claims with leave to amend, the Court similarly dismisses Plaintiff's fourth claim with leave to amend.

### E.   CLAIMS 5–7: BREACH OF FIDUCIARY DUTY

Defendants argue that Plaintiff's fifth, sixth, and seventh claims should be dismissed for the same reasons Plaintiff fails to raise a fraud claim. (MTD 25:10–23). Indeed, as explained

above, the Court dismisses Plaintiff's fraud claims with leave to amend.  Because Plaintiff's

breach of fiduciary duty claim is based on the same allegations as raised in the fraud claims,[6]

the Court accordingly dismisses Plaintiff's fifth, sixth, and seventh claims with leave to amend.

## F.   CLAIMS 8–9: RESCISSION OF AMENDMENTS

Defendants move to dismiss Plaintiff's eighth and ninth claims concerning rescission of

the Second Amendment and First Amendment because rescission itself is not a claim, and

Plaintiff does not otherwise tie the theory of rescission to an underlying legal theory. (MTD

25:23–26:6).

As Defendants correctly point out, "rescission is not a cause of action." *James Erickson*

*Family P'ship LLLP v. Transamerica Life Ins. Co*., No. CV-18-04566-PHX-DWL, 2019 U.S.

Dist. LEXIS 164289, at *25 (D. Ariz. Sep. 25, 2019); *see also Repwest Ins. Co. v. Praetorian*

*Ins. Co.*, 890 F. Supp. 2d 1168, 1181 (D. Ariz. 2012) ("[R]escission is not a claim, but rather a

remedy . . . ."). Multiple federal district courts in Arizona, in interpreting Arizona contract law,

have held that "[g]enerally, three remedies are available for a breach of contract: rescission,

continued performance, or termination and damages." *Cty. of La Paz v. Yakima Compost Co.*,

224 Ariz. 590, 233 P.3d 1169, 1189 (Ariz. Ct. App. 2010) (citing *W. Pinal Family Health Ctr.,*

*Inc. v. McBryde*, 162 Ariz. 546, 785 P.2d 66, 68 (Ariz. Ct. App.1989)). Notably, Plaintiff does

not substantively respond to Defendants' argument concerning rescission as a cause of action.

(*See* Resp. to MTD 27:1–5); (*see also* Reply to MTD 13:22–14:1). Because Plaintiff raises

rescission as two standalone claims in its Amended Complaint, the Court thus dismisses

Plaintiff's eighth and ninth claims without leave to amend.[7]

---

[6] For example, Plaintiff in its fifth claim, alleges that Razaghi Healthcare breached its fiduciary duty to Sage Memorial "[b]y engaging in the Pattern of Rackteering Activity, the Predicate Acts, the 2013 Razaghi Compensation Fraud, the June 2017 Razaghi Compensation Fraud, the December 2017 Razaghi Compensation Fraud, and the Termination Payment Fraud." (Am. Compl. ¶ 209).

[7] Like the federal district court in Arizona, the Court dismisses the rescission claims to the extent Plaintiff raises them as individual causes of action but does not rule on the appropriateness of rescission as a remedy. *James*

1

2
3
4
5
6
7
8
9
10

11
12
13
14
15
16
17
18
19
20
21
22

23

24
25

### G.   CLAIMS 10–11: BREACH OF CONTRACT

Defendants move to dismiss Plaintiff's tenth and eleventh claims based on breach of contract. (MTD 27:7–28:21). As to Plaintiff's tenth claim, Defendants argue that Plaintiff fails to adequately plead breach of contract as to the termination fee because Sage does not allege that any fraudulent expenses were charged by RDC. (Id 27:18–28:2). As to Plaintiff's eleventh claim, Defendants assert that Plaintiff's breach of contract claim is time barred, and Plaintiff cannot otherwise demonstrate breach of contract relating to Razaghi's base pay rate. (Id. 28:3–28:21). In response, Plaintiff contends that it has properly plead the elements for both breach of contract claims such that it has provided adequate notice to Defendants. (Resp. to MTD 27:6–25).

Regarding Plaintiff's tenth claim, Plaintiff fails to allege a plausible breach of contract claim. To succeed in a breach of contract claim under Arizona state law, a plaintiff must show that "an enforceable contract exists, that it was breached, and that the plaintiff suffered damages." *Williams v. Alhambra Sch. Dist. No. 68*, 234 F. Supp. 3d 971, 984 (D. Ariz. 2017); *see also Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975). Neither party disputes the validity of the Second Amendment to the CEO Services Contract. Plaintiff alleges that Defendants breached Paragraphs 5(D)(1) and (2) of the Second Amendment because such contractual provisions do not allow Razaghi Healthcare to include reimbursement for the cost of venders, fraudulent expenses, or work otherwise unrelated to Sage. (Am. Compl. ¶ 252). Plaintiff broadly claims that such reimbursement is not alleged under the Second Amendment to the CEO Services; however, does not provide specific facts to put Defendants on notice as to the material breach of contract. Plaintiff further fails to allege that such expenses were

---

*Erickson Family P'ship LLLP v. Transamerica Life Ins. Co.*, No. CV-18-04566-PHX-DWL, 2019 U.S. Dist. LEXIS 164289, at *25 (D. Ariz. Sep. 25, 2019). Further, because Plaintiff cannot plead additional facts to otherwise remedy its rescission claims because rescission is not a cause of action, the Court dismisses the claims without leave to amend.

fraudulent or not allowed. (*Id*. ¶ 252) (naming the unauthorized costs and expense as "non-allowed expenses" but not explaining whether the expenses were not permitted).  Notably, Plaintiff does not respond to Defendants' arguments to establish material breach. (Resp. to MTD 27:6–25).  Because Plaintiff fails to allege a material breach but could plead more specific facts, Plaintiff's tenth claim for breach of contract is dismissed with leave to amend.

Plaintiff's eleventh claim is time-barred.  "In Arizona, the statute of limitations for the breach of a written contract is six years." *Cornelis v. B&J Smith Assocs. LLC*, No. CV-13-00645-PHX-BSB, 2014 U.S. Dist. LEXIS 63776, at *21 (D. Ariz. May 8, 2014); *see also* Ariz. Rev. Stat. § 12-548.  Here, Plaintiff alleges that Defendants breached the CEO Services Contract and the Second Amendment to the CEO Services Contract by billing Razaghi at $495 per hour, beginning on or about May 20, 2013. (Am. Compl. ¶ 262).  Plaintiff filed his breach of contract claim pertaining to Razaghi's base pay rate on May 28, 2021. (*See generally* Am. Compl., ECF No. 144).  Because Plaintiff filed this claim approximately eight years after the alleged breach, Plaintiff's eleventh claim is time-barred and thus, dismissed with prejudice.

### H.   CLAIM 12: BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

Defendants argue that Plaintiff's twelfth claim—breach of covenant of good faith and fair dealing—must be dismissed because the claim is time-barred and further, that the claim is not actionable since RDC did not fail to obtain approval from the Sage Board. (MTD 28:22–29:9).  Plaintiff, in response, argue that Defendants inappropriately ask the Court to rely on unauthenticated documents, and additionally, the claim is not time-barred because Plaintiff initiated this action on October 31, 2018—within two years of bringing this claim. (Resp. to MTD 28:1–9).

The statute of limitations for this claim is two years.[8] A.R.S. § 12-542(3); *see also Salcido v. JPMorgan Chase Bank NA*, No. CV-14-02560-PHX-DGC, 2015 U.S. Dist. LEXIS 33399, at *11 (D. Ariz. Mar. 17, 2015).  "[A] plaintiff's cause of action does not accrue until the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause." *Frew v. Coit Servs.*, No. CV-07-1372-PHX-DGC, 2007 U.S. Dist. LEXIS 74027, at *4 (D. Ariz. Oct. 2, 2007) (citing *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 182 Ariz. 586, 898 P.2d 964, 966 (Ariz. 1995).

Here, the parties dispute when Plaintiff knew or should have known of the breach of covenant claim.  Plaintiff alleges that it first discovered Defendants' breach on October 31, 2018 but does not provide any supporting evidence. (Resp. to MTD 28:7–9.)  In their Reply, Defendants contend that Plaintiff alleges facts occurring before May 28, 2019, and further, that Plaintiff has not pled sufficient information to demonstrate equitable tolling or that Sage could not have discovered Mr. Razaghi's billing rate through reasonable diligence. (Reply 14:22–15:7.)  The Court agrees that there are insufficient facts, at this stage, to determine whether the breach of covenant claim is time barred. *See Frew v. Coit Servs.*, No. CV-07-1372-PHX-DGC, 2007 U.S. Dist. LEXIS 74027, at *5 (D. Ariz. Oct. 2, 2007) ("The Court concludes that when Plaintiff knew or should have known about the fraud and misrepresentation claims is a factual question properly decided after discovery.").  Accordingly, the Court finds that Plaintiff plausibly pleads a breach of covenant claim.

## I.    CLAIM 13: CONVERSION

Defendants argue that Plaintiff's amended thirteenth claim—conversion—must be dismissed because the economic loss doctrine bars the claim and further, the contracts were not void or unconscionable. (MTD 29:11–30:1.)  Plaintiff asserts, in response, that the economic

---

[8] The parties do not dispute that the applicable statute of limitations is two years.

loss doctrine does not bar all types of cases, but only constructive defect and products liability cases. (Resp. to MTD 28:10–16).

"Arizona has adopted the definition of conversion contained in the Restatement (Second) of Torts § 222A(1) (1965): an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Universal Mktg. & Enter., Inc. v. Bank One of Ariz., N.A.*, 53 P.3d 191, 193 (Ariz. Ct. App. 2002).  Mere interference does not support a claim to conversion; rather, the requisite substantial interference requires hostility. *Focal Point v. U-Haul Co.*, 746 P.2d 488, 489–90 (Ariz. Ct. App. 1986).  To determine the seriousness of the alleged interference, the court must consider: (1) the extent and duration of the alleged control over the property; (2) defendant's intent to assert a right to control the property; (3) the extent and duration of the resulting interference with plaintiff's right of control; (4) damage done to the property; and (5) inconvenience and expense caused to plaintiff. *See Focal Point v. U-Haul Co.*, 746 P.2d 488, 490 (Ariz. Ct. App. 1986) (citing Restatement (Second) of Torts § 222(A)(2).  "The proper plaintiff in a conversion action is one 'who had the right to immediate possession of the chattel at the time of the alleged conversion.'" *Universal Mktg. & Enter., Inc.*, 53 P.3d at 193.

Contrary to Plaintiff's assertion, the economic loss doctrine does not apply solely to product liability and construction cases. *Greyhound Lines Inc. v. Viad Corp.*, No. CV-15-01820-PHX-DGC, 2016 U.S. Dist. LEXIS 160960, at *21 (D. Ariz. Nov. 21, 2016).  "Rather, the Arizona Supreme Court explained that application of the doctrine to various tort claims requires a context-specific analysis that must take into account the policies behind contract and tort law." *Id.*; *see also Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 Ariz. 320, 223 P.3d 664, 669 (2010) (cataloguing cases in which Arizona courts have applied the economic loss doctrine outside construction and product liability cases); *see also Cook v. Orkin*

*Exterminating Co.*, 227 Ariz. 331, 258 P.3d 149, 150 (Ariz. Ct. App. 2011) (finding that the economic loss doctrine bars tort claims relating to a pest control company's failure to exterminate terminates).  Notably, Plaintiff does not provide any citations to support its assertion that the economic loss doctrine applies on a limited basis. (Resp. to MTD 28:13–15).  Plaintiff otherwise does not dispute applicability of the economic loss doctrine.

Upon the Court's own review, the economic loss doctrine bars Plaintiff's tort claim of conversion.  Courts in Arizona dismiss conversion claims based on the economic loss doctrine if the harms alleged in the tort claim are based on the same alleged conduct in the contract claim. *Maricopa Cty. v. Office Depot, Inc.*, No. 2:14-cv-1372-HRH, 2014 U.S. Dist. LEXIS 164331 (D. Ariz. Nov. 21, 2014) ("[b]ecause plaintiff's common law fraud claims are based on the same alleged conduct as its contract claims, these claims are barred by the economic loss rule."); *see also Greyhound Lines Inc. v. Viad Corp.*, No. CV-15-01820-PHX-DGC, 2016 U.S. Dist. LEXIS 160960, at *22 (D. Ariz. Nov. 21, 2016) (cataloging cases in which courts have applied the economic loss doctrine to non-product liability and construction cases).  Plaintiff also does not meaningfully respond to Defendants' argument relating to the economic loss doctrine.  For the forgoing reasons, the Court accordingly dismisses Plaintiff's claim for conversion with prejudice. *See Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006).

### J.      CLAIM 15: UNJUST ENRICHMENT

Defendants argue that Plaintiff's fifteenth claim—unjust enrichment—must be dismissed because the doctrine of unjust enrichment does not apply when there is a valid, existing contract. (MTD 30:7–11).  In response, Plaintiff asserts that dismissing an unjust enrichment claim at this stage is premature given that a plaintiff may plead an unjust enrichment claim in the alternative. (Resp. to MTD 28:17–25).

"To sufficiently state a claim for unjust enrichment, a plaintiff must plead five elements: '(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of justification for the enrichment and the impoverishment; and (5) an absence of a remedy provided by law.'" *Zoldessy v. MUFG Union Bank, N.A.*, No. CV-20-08329-PCT-SPL, 2021 U.S. Dist. LEXIS 84538, at *5 (D. Ariz. May 3, 2021) (citing *Cmty. Guardian Bank v. Hamlin*, 182 Ariz. 627, 630, 898 P.2d 1005 (Ariz. Ct. App. 1995)). "[T]he existence of a contract specifically governing the rights and obligations of each party precludes recovery for unjust enrichment." *USLife v. Gutkin*, 152 Ariz. 349, 732 P.2d 579, 584 (Ariz. Ct. App. 1986). However, a claim for unjust enrichment may be plead in the alternative to a breach of contract claim. *See McNutt v. Key Fin. Corp.*, 2010 U.S. Dist. LEXIS 95291, 2010 WL 3702509, * 2 (D.Ariz. Sept. 9, 2010); *Johnson v. KB Home*, 720 F. Supp. 2d 1109, 2010 WL 1268144, * 10 (D.Ariz. 2010). Because Plaintiff can alternatively plead an unjust enrichment claim and Defendants do not robustly dispute Plaintiff's allegations,[9] the Court denies Defendant's Motion to Dismiss Plaintiff's unjust enrichment claim. Plaintiff has adequately alleged an unjust enrichment claim.

## K.    CLAIM 16: CONSTRUCTIVE TRUST

Defendants argue that Plaintiff's sixteenth claim—constructive trust—must be dismissed because it is an equitable remedy and not an independent cause of action. (MTD 30:8–11.) Sage's Response does not address this claim. (*See* Resp. to MTD, ECF No. 164.) As Sage has effectively conceded that its Complaint does not and cannot adequately allege a claim of

---

[9] Defendants argue, in their Reply, that "Plaintiff's unjust enrichment claim merely states that Defendants were wrongfully enriched through their alleged racketeering activity. This claim is also subject to dismissal with prejudice because it is duplicative of its fraud and RICO claims, and because it sounds in fraud, said claim is not properly pled under Rule 9." (Reply 15:14–19). First, Defendants improperly raise three new arguments in their Reply. *See Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for the first time in the reply brief are waived."). Defendants also fail to sufficiently explain their arguments in the Reply. (Reply 15:14–19). The Court accordingly does not address Defendants' arguments raised in their Reply.

constructive trust, the Court dismisses the claim with prejudice. *See Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006).

### L.    LEAVE TO AMEND

Rule 15(a)(2) of the Federal Rules of Civil Procedure permits courts to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).  The Ninth Circuit "ha[s] held that in dismissing for failure to state a claim under Rule 12(b)(6), 'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

Here, the Court finds that Plaintiff may be able to cure the deficiencies in its Third, Fourth, Fifth, Sixth, Seventh, Tenth, and Fourteenth Claims.  Accordingly, the Court will grant Plaintiff leave to file an amended complaint.  Plaintiff shall file its amended complaint within twenty-one (21) days of the date of this Order if it can allege sufficient facts.  Failure to file an amended complaint by this date shall result in the Court dismissing these claims with prejudice.

## IV.    <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that the Second Motion to Dismiss, (ECF No. 147), is **GRANTED in part and DENIED in part**.  Sage shall have twenty-one (21) days from entry of this Order to file an Amended Complaint curing the deficiencies identified by this Order.

Dated this 30 day of March, 2022.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT